Nathan Dooley (SBN 224331)
601 S. Figueroa Street, Suite 3700
Los Angeles, CA 90017
Tel.: 213.892.7933; Fax: 213.892.7999

Elliott R. Feldman (*pro hac vice to be filed*)
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Tel.: 215.665.2071; Fax: 215.701.2282

Kevin P. Caraher (*pro hac vice to be filed*)
123 North Wacker Drive, Suite 1800
Chicago, IL 60606
Tel.: 312.382.3192; Fax: 312.706.9792

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

STATE AUTOMOBILE MUTUAL
INSURANCE COMPANY; STATE
AUTO PROPERTY & CASUALTY
INSURANCE COMPANY; MILBANK
INSURANCE COMPANY; MERIDIAN
SECURITY INSURANCE CO; HOME
STATE COUNTY MUTUAL
INSURANCE COMPANY; AMERICAN
FAMILY INSURANCE COMPANY;
AMERICAN FAMILY CONNECT
INSURANCE COMPANY; AMERICAN
FAMILY CONNECT PROPERTY &
CASUALTY INSURANCE COMPANY;
AMERICAN FAMILY MUTUAL
INSURANCE COMPANY, S.I.;
AMERICAN STANDARD INSURANCE
COMPANY OF OHIO; AMERICAN
STANDARD INSURANCE COMPANY
OF WISCONSIN; GRAIN DEALERS
MUTUAL INSURANCE COMPANY;
MAIN STREET AMERICA
ASSURANCE COMPANY; MAIN
STREET AMERICA PROTECTION
INSURANCE COMPANY; MIDVALE
INDEMNITY COMPANY; NGM
INSURANCE COMPANY; OLD
AMERICAN COUNTY MUTUAL FIRE
INSURANCE COMPANY; OLD
DOMINION INSURANCE COMPANY;
PERMANENT GENERAL

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 8:23-cv-00439_____

**CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

DEMAND FOR JURY TRIAL

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

1   ASSURANCE CORPORATION;
    PERMANENT GENERAL
2   ASSURANCE CORPORATION OF
    OHIO; THE GENERAL AUTOMOBILE
3   INSURANCE COMPANY, INC.; ERIE
    INSURANCE COMPANY; ERIE
4   INSURANCE EXCHANGE ; ERIE
    INSURANCE COMPANY OF NEW
5   YORK; ERIE INSURANCE PROPERTY
    & CASUALTY CO.; AMERICAN
6   STATES INSURANCE COMPANY;
    AMERICAN STATES PREFERRED
7   INSURANCE COMPANY;
    CONSOLIDATED INSURANCE
8   COMPANY; FIRST NATIONAL
    INSURANCE COMPANY OF
9   AMERICA; LIBERTY COUNTY
    MUTUAL INSURANCE COMPANY;
10  LIBERTY INSURANCE
    CORPORATION; LIBERTY MUTUAL
11  FIRE INSURANCE COMPANY;
    LIBERTY MUTUAL INSURANCE
12  COMPANY; LIBERTY MUTUAL
    PERSONAL INSURANCE COMPANY;
13  LM GENERAL INSURANCE
    COMPANY; LM INSURANCE
14  CORPORATION; SAFECO
    INSURANCE COMPANY OF
15  AMERICA; SAFECO INSURANCE
    COMPANY OF ILLINOIS; SAFECO
16  INSURANCE COMPANY OF
    INDIANA; SAFECO INSURANCE
17  COMPANY OF OREGON; THE FIRST
    LIBERTY INSURANCE
18  CORPORATION; WAUSAU
    UNDERWRITERS INSURANCE
19  COMPANY; OHIO SECURITY
    INSURANCE COMPANY; EXCELSIOR
20  INSURANCE COMPANY; COMPANY
    OF AMERICA; LIBERTY SURPLUS
21  INSURANCE CORPORATION;
    ALLIED PROPERTY & CASUALTY
22  INSURANCE COMPANY; AMCO
    INSURANCE COMPANY; COLONIAL
23  COUNTY MUTUAL INSURANCE CO.;
    DEPOSITORS INSURANCE
24  COMPANY; HARLEYSVILLE
    INSURANCE COMPANY;
25  NATIONWIDE AFFINITY
    INSURANCE COMPANY OF
26  AMERICA; NATIONWIDE
    AGRIBUSINESS INSURANCE
27  COMPANY; NATIONWIDE
    ASSURANCE COMPANY;
28  NATIONWIDE GENERAL

LEGAL\62042293\1

INSURANCE COMPANY;
NATIONWIDE INSURANCE
COMPANY OF AMERICA;
NATIONWIDE MUTUAL FIRE
INSURANCE COMPANY;
NATIONWIDE MUTUAL INSURANCE
COMPANY; NATIONWIDE
PROPERTY & CASUALTY
INSURANCE COMPANY; TITAN
INSURANCE COMPANY; VICTORIA
FIRE & CASUALTY COMPANY; NEW
JERSEY INDEMNITY INSURANCE
COMPANY; NEW JERSEY
MANUFACTURERS INSURANCE
COMPANY; GENERAL CASUALTY
COMPANY OF WISCONSIN;
GENERAL CASUALTY INSURANCE
COMPANY; and SOUTHERN PILOT
INSURANCE COMPANY

               Plaintiffs,

         v.

HYUNDAI MOTOR AMERICA,
HYUNDAI MOTOR COMPANY, KIA
AMERICA, INC., KIA CORPORATION

               Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

COZEN O´ CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

## **COMPLAINT**

Plaintiffs, State Automobile Mutual Insurance Company; State Auto Property & Casualty Insurance Company; Milbank Insurance Company; Meridian Security Insurance Co; Home State County Mutual Insurance Company; American Family Insurance Company; American Family Connect Insurance Company; American Family Connect Property & Casualty Insurance Company; American Family Mutual Insurance Company, S.I.; American Standard Insurance Company Of Ohio; American Standard Insurance Company Of Wisconsin; Grain Dealers Mutual Insurance Company; Main Street America Assurance Company; Main Street America Protection Insurance Company; Midvale Indemnity Company; NGM Insurance Company; Old American County Mutual Fire Insurance Company; Old Dominion Insurance Company; Permanent General Assurance Corporation;

1  Permanent General Assurance Corporation Of Ohio; The General Automobile
2  Insurance Company, Inc.; Erie Insurance Company; Erie Insurance Exchange ; Erie
3  Insurance Company Of New York; Erie Insurance Property & Casualty Co.;
4  American States Insurance Company; American States Preferred Insurance
5  Company; Consolidated Insurance Company; First National Insurance Company Of
6  America; Liberty County Mutual Insurance Company; Liberty Insurance
7  Corporation; Liberty Mutual Fire Insurance Company; Liberty Mutual Insurance
8  Company; Liberty Mutual Personal Insurance Company; LM General Insurance
9  Company; LM Insurance Corporation; Safeco Insurance Company Of America;
10 Safeco Insurance Company Of Illinois; Safeco Insurance Company Of Indiana;
11 Safeco Insurance Company Of Oregon; The First Liberty Insurance Corporation;
12 Wausau Underwriters Insurance Company; Ohio Security Insurance Company;
13 Excelsior Insurance Company; Liberty Surplus Insurance Corporation; Allied
14 Property & Casualty Insurance Company; Amco Insurance Company; Colonial
15 County Mutual Insurance Co.; Depositors Insurance Company; Harleysville
16 Insurance Company; Nationwide Affinity Insurance Company Of America;
17 Nationwide Agribusiness Insurance Company; Nationwide Assurance Company;
18 Nationwide General Insurance Company; Nationwide Insurance Company Of
19 America; Nationwide Mutual Fire Insurance Company; Nationwide Mutual
20 Insurance Company; Nationwide Property & Casualty Insurance Company; Titan
21 Insurance Company; Victoria Fire & Casualty Company; New Jersey Indemnity
22 Insurance Company; New Jersey Manufacturers Insurance Company; General
23 Casualty Company Of Wisconsin; General Casualty Insurance Company; and
24 Southern Pilot Insurance Company, individually and on behalf of all other similarly
25 situated insurance companies that issue and underwrite property and automobile
26 insurance coverage in the United States, bring this class action against Hyundai
27 Motor America, Hyundai Motor Company, Kia America, Inc., and Kia Corporation.
28

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

### THE PARTIES

1.     Plaintiff, State Automobile Mutual Insurance Company is a corporation organized and existing under the laws of the State of Ohio, with a principal place of business located at 518 East Broad Street, Columbus, Ohio 43215 which, at all times material hereto was engaged in the business of issuing policies of insurance.

2.     Plaintiff, State Auto Property & Casualty Insurance Company is a corporation organized and existing under the laws of the State of Iowa, with a principal place of business located at 518 East Broad Street, Columbus, Ohio 43215 which, at all times material hereto was engaged in the business of issuing policies of insurance.

3.     Plaintiff, Milbank Insurance Company is a corporation organized and existing under the laws of the State of Iowa, with a principal place of business located at 4601 Westown Parkway, Suite 300, West Des Moines, Iowa 50266 which, at all times material hereto was engaged in the business of issuing policies of insurance.

4.     Plaintiff, Meridian Security Insurance Co is a corporation organized and existing under the laws of the State of Indiana, with a principal place of business located at 12900 N. Meridian Street, Suite 200, Carmel, Indiana 46032 which, at all times material hereto was engaged in the business of issuing policies of insurance.

5.     Plaintiff, Home State County Mutual Insurance Company is a corporation organized and existing under the laws of the State of Texas, with a principal place of business located at 4315 Lake Shore Drive, Ste. J, Waco, Texas 76710 which, at all times material hereto was engaged in the business of issuing policies of insurance.

6.     Plaintiff, American Family Insurance Company is a corporation organized and existing under the laws of the State of Wisconsin, with a principal place of business located at 6000 American Parkway, Madison, Wisconsin 53873,

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

LEGAL\62042293\1

which, at all times material hereto was engaged in the business of issuing policies of insurance.

7.    Plaintiff, American Family Connect Insurance Company, is a corporation organized and existing under the laws of the State of Wisconsin, with a principal place of business located at 3500 Packerland Drive, De Pere, Wisconsin 54115 which, at all times material hereto was engaged in the business of issuing policies of insurance.

8.    Plaintiff, American Family Connect Property & Casualty Insurance Company, is a corporation organized and existing under the laws of the State of Wisconsin, with a principal place of business located at 3500 Packerland Drive, De Pere, Wisconsin 54115 which, at all times material hereto was engaged in the business of issuing policies of insurance.

9.    Plaintiff, American Family Mutual Insurance Company, S.I., is a corporation organized and existing under the laws of the State of Wisconsin, with a principal place of business located at 6000 American Parkway, Madison, Wisconsin 53873 which, at all times material hereto was engaged in the business of issuing policies of insurance.

10.    Plaintiff, American Standard Insurance Company of Ohio, is a corporation organized and existing under the laws of the State of Wisconsin, with a principal place of business located at 6000 American Parkway, Madison, Wisconsin 53873 which, at all times material hereto was engaged in the business of issuing policies of insurance.

11.    Plaintiff, American Standard Insurance Company of Wisconsin, is a corporation organized and existing under the laws of the State of Wisconsin, with a principal place of business located at 6000 American Parkway, Madison, Wisconsin 53873 which, at all times material hereto was engaged in the business of issuing policies of insurance.

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

12.     Plaintiff, Grain Dealers Mutual Insurance Company, is a corporation organized and existing under the laws of the State of Indiana, with a principal place of business located at 900 E. 96th Street, Ste. 200, Indianapolis, Indiana 46278, which, at all times material hereto was engaged in the business of issuing policies of insurance.

13.     Plaintiff, Main Street America Assurance Company, is a corporation organized and existing under the laws of the State of Florida, with a principal place of business located at 4601 Touchton Road East, Ste. 3400, Jacksonville, Florida 32246 which, at all times material hereto was engaged in the business of issuing policies of insurance.

14.     Plaintiff, Main Street America Protection Insurance Company is a corporation organized and existing under the laws of the State of Florida, with a principal place of business located at 4601 Touchton Road East, Ste. 3400, Jacksonville, Florida 32246 which, at all times material hereto was engaged in the business of issuing policies of insurance.

15.     Plaintiff, Midvale Indemnity Company, is a corporation organized and existing under the laws of the State of Wisconsin, with a principal place of business located at 6000 American Parkway, Madison, Wisconsin 53873 which, at all times material hereto was engaged in the business of issuing policies of insurance.

16.     Plaintiff, NGM Insurance Company, is a corporation organized and existing under the laws of the State of Florida, with a principal place of business located at 4601 Touchton Road East, Ste. 3400, Jacksonville, Florida 32246 which, at all times material hereto was engaged in the business of issuing policies of insurance.

17.     Plaintiff, Old American County Mutual Fire Insurance Company, is a corporation organized and existing under the laws of the State of Texas, with a principal place of business located at 14675 Dallas Pkwy. Ste. 500, Dallas, Texas

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

1  75254 which, at all times material hereto was engaged in the business of issuing

2  policies of insurance.

3     18.   Plaintiff, Old Dominion Insurance Company is a corporation organized

4  and existing under the laws of the State of Florida, with a principal place of

5  business located at 4601 Touchton Road East, Ste. 3400, Jacksonville, Florida

6  32246 which, at all times material hereto was engaged in the business of issuing

7  policies of insurance.

8     19.   Plaintiff, Permanent General Assurance Corporation is a corporation

9  organized and existing under the laws of the State of Wisconsin, with a principal

10  place of business located at 2636 Elm Hill Pike, Nashville, Tennessee 37214 which,

11  at all times material hereto was engaged in the business of issuing policies of

12  insurance.

13     20.   Plaintiff, Permanent General Assurance Corporation of Ohio is a

14  corporation organized and existing under the laws of the State of Wisconsin, with a

15  principal place of business located at 2636 Elm Hill Pike, Nashville, Tennessee

16  37214 which, at all times material hereto was engaged in the business of issuing

17  policies of insurance.

18     21.   Plaintiff, The General Automobile Insurance Company, Inc. is a

19  corporation organized and existing under the laws of the State of Wisconsin, with a

20  principal place of business located at 2636 Elm Hill Pike, Nashville, Tennessee

21  37214 which, at all times material hereto was engaged in the business of issuing

22  policies of insurance.

23     22.   Plaintiff, Erie Insurance Company is a corporation organized and

24  existing under the laws of the State of Pennsylvania, with a principal place of

25  business located at 100 Erie Insurance Place, Erie, Pennsylvania 16530 which, at

26  all times material hereto was engaged in the business of issuing policies of

27  insurance.

28

COZEN O´ CONNOR
601 S. FIGUEROA STREET , SUITE 3700
LOS ANGELES, CA 90017

23.   Plaintiff, Erie Insurance Exchange is an unincorporated reciprocal exchange with a principal place of business located at100 Erie Insurance Place, Erie, Pennsylvania 16530 which, at all times material hereto was engaged in the business of issuing policies of insurance.

24.   Plaintiff, Erie Insurance Company of New York is a corporation organized and existing under the laws of the State of New York, with a principal place of business located at 100 Erie Insurance Place, Erie, Pennsylvania 16530 which, at all times material hereto was engaged in the business of issuing policies of insurance.

25.   Plaintiff, Erie Insurance Property & Casualty Co. is a corporation organized and existing under the laws of the State of Pennsylvania, with a principal place of business located at 100 Erie Insurance Place, Erie, Pennsylvania 16530 which, at all times material hereto was engaged in the business of issuing policies of insurance.

26.   Plaintiff, American States Insurance Company is a corporation organized and existing under the laws of the State of Indiana, with a principal place of business located at 175 Berkley Street, Boston, Massachusetts 02116 which, at all times material hereto was engaged in the business of issuing policies of insurance.

27.   Plaintiff, American States Preferred Insurance Company is a corporation organized and existing under the laws of the State of Indiana, with a principal place of business located at 175 Berkley Street, Boston, Massachusetts 02116 which, at all times material hereto was engaged in the business of issuing policies of insurance.

28.   Plaintiff, Consolidated Insurance Company is a corporation organized and existing under the laws of the State of Indiana, with a principal place of business located at 175 Berkley Street, Boston, Massachusetts 02116 which, at all times material hereto was engaged in the business of issuing policies of insurance.

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

LEGAL\62042293\1

29.    Plaintiff, First National Insurance Company of America is a corporation organized and existing under the laws of the State of New Hampshire, with a principal place of business located at 175 Berkley Street, Boston, Massachusetts 02116 which, at all times material hereto was engaged in the business of issuing policies of insurance.

30.    Plaintiff, Liberty County Mutual Insurance Company is a corporation organized and existing under the laws of the State of Texas, with a principal place of business located at 175 Berkley Street, Boston, Massachusetts 02116 which, at all times material hereto was engaged in the business of issuing policies of insurance.

31.    Plaintiff, Liberty Insurance Corporation is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business located at 175 Berkley Street, Boston, Massachusetts 02116 which, at all times material hereto was engaged in the business of issuing policies of insurance.

32.    Plaintiff, Liberty Mutual Fire Insurance Company is a corporation organized and existing under the laws of the State of Massachusetts, with a principal place of business located at 175 Berkley Street, Boston, Massachusetts 02116 which, at all times material hereto was engaged in the business of issuing policies of insurance.

33.    Plaintiff, Liberty Mutual Insurance Company is a corporation organized and existing under the laws of the State of Massachusetts, with a principal place of business located at 175 Berkley Street, Boston, Massachusetts 02116 which, at all times material hereto was engaged in the business of issuing policies of insurance.

34.    Plaintiff, Liberty Mutual Personal Insurance Company is a corporation organized and existing under the laws of the State of Massachusetts, with a principal place of business located at 175 Berkley Street, Boston, Massachusetts 02116 which, at all times material hereto was engaged in the business of issuing policies of insurance.

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

35.   Plaintiff, LM General Insurance Company is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business located at 175 Berkley Street, Boston, Massachusetts 02116 which, at all times material hereto was engaged in the business of issuing policies of insurance.

36.   Plaintiff, LM Insurance Corporation is a corporation organized and existing under the laws of the State of Indiana, with a principal place of business located at 175 Berkley Street, Boston, Massachusetts 02116 which, at all times material hereto was engaged in the business of issuing policies of insurance.

37.   Plaintiff, Safeco Insurance Company of America is a corporation organized and existing under the laws of the State of New Hampshire, with a principal place of business located at 175 Berkley Street, Boston, Massachusetts 02116 which, at all times material hereto was engaged in the business of issuing policies of insurance.

38.   Plaintiff, Safeco Insurance Company of Illinois is a corporation organized and existing under the laws of the State of Illinois, with a principal place of business located at 175 Berkley Street, Boston, Massachusetts 02116 which, at all times material hereto was engaged in the business of issuing policies of insurance.

39.   Plaintiff, Safeco Insurance Company of Indiana is a corporation organized and existing under the laws of the State of Indiana, with a principal place of business located at 175 Berkley Street, Boston, Massachusetts 02116 which, at all times material hereto was engaged in the business of issuing policies of insurance.

40.   Plaintiff, Safeco Insurance Company of Oregon is a corporation organized and existing under the laws of the State of Oregon, with a principal place of business located at 175 Berkley Street, Boston, Massachusetts 02116 which, at all times material hereto was engaged in the business of issuing policies of insurance.

LEGAL\62042293\1

41.    Plaintiff, The First Liberty Insurance Corporation is a corporation organized and existing under the laws of the State of Illinois, with a principal place of business located at 175 Berkley Street, Boston, Massachusetts 02116 which, at all times material hereto was engaged in the business of issuing policies of insurance.

42.    Plaintiff, Wausau Underwriters Insurance Company is a corporation organized and existing under the laws of the State of Wisconsin, with a principal place of business located at 175 Berkley Street, Boston, Massachusetts 02116 which, at all times material hereto was engaged in the business of issuing policies of insurance.

43.    Plaintiff, Ohio Security, is a corporation organized and existing under the laws of the State of New Hampshire, with a principal place of business located at 175 Berkley Street, Boston, Massachusetts 02116 which, at all times material hereto was engaged in the business of issuing policies of insurance.

44.    Plaintiff, Excelsior Insurance Company is a corporation organized and existing under the laws of the State of New Hampshire, with a principal place of business located at 175 Berkley Street, Boston, Massachusetts 02116 which, at all times material hereto was engaged in the business of issuing policies of insurance.

45.    Plaintiff, Liberty Surplus Insurance Corporation is a corporation organized and existing under the laws of the State of New Hampshire, with a principal place of business located at 175 Berkley Street, Boston, Massachusetts 02116 which, at all times material hereto was engaged in the business of issuing policies of insurance.

46.    Plaintiff, Allied Property & Casualty Insurance Company is a corporation organized and existing under the laws of the State of Iowa, with a principal place of business located at One West Nationwide Blvd., Columbus, Ohio 43215 which, at all times material hereto was engaged in the business of issuing policies of insurance.

LEGAL\62042293\1

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

47.     Plaintiff, Amco Insurance Company is a corporation organized and existing under the laws of the State of Iowa, with a principal place of business located at One West Nationwide Blvd., Columbus, Ohio 43215 which, at all times material hereto was engaged in the business of issuing policies of insurance.

48.     Plaintiff, Colonial County Mutual Insurance Co. is a corporation organized and existing under the laws of the State of Texas, with a principal place of business located at One West Nationwide Blvd., Columbus, Ohio 43215 which, at all times material hereto was engaged in the business of issuing policies of insurance.

49.     Plaintiff, Depositors Insurance Company is a corporation organized and existing under the laws of the State of Iowa, with a principal place of business located at One West Nationwide Blvd., Columbus, Ohio 43215 which, at all times material hereto was engaged in the business of issuing policies of insurance.

50.     Plaintiff, Harleysville Insurance Company is a corporation organized and existing under the laws of the State of Ohio, with a principal place of business located at One West Nationwide Blvd., Columbus, Ohio 43215 which, at all times material hereto was engaged in the business of issuing policies of insurance.

51.     Plaintiff, Nationwide Affinity Insurance Company of America is a corporation organized and existing under the laws of the State of Ohio, with a principal place of business located at One West Nationwide Blvd., Columbus, Ohio 43215 which, at all times material hereto was engaged in the business of issuing policies of insurance.

52.     Plaintiff, Nationwide Agribusiness Insurance Company is a corporation organized and existing under the laws of the State of Iowa, with a principal place of business located at One West Nationwide Blvd., Columbus, Ohio 43215 which, at all times material hereto was engaged in the business of issuing policies of insurance.

COZEN O' CONNOR
601 S. FIGUEROA STREET , SUITE 3700
LOS ANGELES, CA 90017

53.     Plaintiff, Nationwide Assurance Company is a corporation organized and existing under the laws of the State of Ohio, with a principal place of business located at One West Nationwide Blvd., Columbus, Ohio 43215 which, at all times material hereto was engaged in the business of issuing policies of insurance.

54.     Plaintiff, Nationwide General Insurance Company is a corporation organized and existing under the laws of the State of Ohio, with a principal place of business located at One West Nationwide Blvd., Columbus, Ohio 43215 which, at all times material hereto was engaged in the business of issuing policies of insurance.

55.     Plaintiff, Nationwide Insurance Company of America is a corporation organized and existing under the laws of the State of Ohio, with a principal place of business located at One West Nationwide Blvd., Columbus, Ohio 43215 which, at all times material hereto was engaged in the business of issuing policies of insurance.

56.     Plaintiff, Nationwide Mutual Fire Insurance Company was a corporation organized and existing under the laws of the State of Ohio, with a principal place of business located at One West Nationwide Blvd., Columbus, Ohio 43215 which, at all times material hereto was engaged in the business of issuing policies of insurance. Nationwide Mutual Fire Insurance Company merged into Plaintiff Nationwide Mutual Insurance Company as of January 1, 2023.

57.     Plaintiff, Nationwide Mutual Insurance Company is a corporation organized and existing under the laws of the State of Ohio, with a principal place of business located at One West Nationwide Blvd., Columbus, Ohio 43215 which, at all times material hereto was engaged in the business of issuing policies of insurance.

58.     Plaintiff, Nationwide Property & Casualty Insurance Company is a corporation organized and existing under the laws of the State of Ohio, with a principal place of business located at One West Nationwide Blvd., Columbus, Ohio

43215 which, at all times material hereto was engaged in the business of issuing policies of insurance.

59.   Plaintiff, Titan Insurance Company is a corporation organized and existing under the laws of the State of Michigan, with a principal place of business located at One West Nationwide Blvd., Columbus, Ohio 43215 which, at all times material hereto was engaged in the business of issuing policies of insurance.

60.   Plaintiff, Victoria Fire & Casualty Company is a corporation organized and existing under the laws of the State of Ohio, with a principal place of business located at One West Nationwide Blvd., Columbus, Ohio 43215 which, at all times material hereto was engaged in the business of issuing policies of insurance.

61.   Plaintiff, New Jersey Indemnity Insurance Company is a corporation organized and existing under the laws of the State of New Jersey, with a principal place of business located at 301 Sullivan Way, West Trenton, New Jersey 08628 which, at all times material hereto was engaged in the business of issuing policies of insurance.

62.   Plaintiff, New Jersey Manufacturers Insurance Company is a corporation organized and existing under the laws of the State of New Jersey, with a principal place of business located at 301 Sullivan Way, West Trenton, New Jersey 08628 which, at all times material hereto was engaged in the business of issuing policies of insurance.

63.   Plaintiff, General Casualty Company of Wisconsin, is a corporation organized and existing under the laws of the State of Wisconsin, with a principal place of business located at One QBE Way, Sun Prairie, Wisconsin 53956 which, at all times material hereto was engaged in the business of issuing policies of insurance.

64.   Plaintiff, General Casualty Insurance Company, is a corporation organized and existing under the laws of the State of Wisconsin, with a principal place of business located at One QBE Way, Sun Prairie, Wisconsin 53956 which, at

LEGAL\62042293\1

all times material hereto was engaged in the business of issuing policies of insurance.

65.   Plaintiff, Southern Pilot Insurance Company is a corporation organized and existing under the laws of the State of Wisconsin, with a principal place of business located at One QBE Way, Sun Prairie, Wisconsin 53956 which, at all times material hereto was engaged in the business of issuing policies of insurance.

66.   Defendant Hyundai Motor America ("**HMA**") is a California corporation with its principal place of business at 10550 Talbert Avenue, Fountain Valley, CA 92708. HMA engages in substantial business throughout the United States, including in this judicial district.

67.   Defendant Hyundai Motor Company ("**HMC**") is a South Korean corporation with a principal place of business in South Korea. HMC is the parent corporation of HMA.

68.   Defendant HMC, through its various entities, designs, manufactures, markets, distributes, and sells Hyundai automobiles in this judicial district and multiple other locations in the United States.

69.   Defendant HMA is HMC's U.S. sales and marketing division, and it oversees sales and other operations across the United States. HMA distributes Hyundai vehicles and sells these vehicles through its network of dealerships. Money received from the purchase or lease of a Hyundai vehicle from a dealership flows from the dealer to HMC and HMA.

70.   Upon information and belief, Defendant HMC communicates with Defendant HMA concerning virtually all aspects of the Hyundai products which HMC and HMA distribute within the United States.

71.   Upon information and belief, the distribution, service, repair, installation, and other pertinent decisions regarding the engines, as they relate to the defects in the Hyundai vehicles addressed in this action, all were made and performed by Defendants HMA and HMC.

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

72.    Upon information and belief, Defendants HMA and HMC developed the relevant marketing materials regarding the differences between trim packages and warranty booklets for the Hyundai vehicles that are the subject of this action.

73.    Upon information and belief, Defendants HMA and HMC developed the post-purchase owner's manuals, warranty booklets and other pertinent information included in maintenance recommendations and schedules for the Hyundai vehicles that are the subject of this action.

74.    Upon information and belief, the Hyundai dealers that sold Class Vehicles to Plaintiffs' and Class Members' insureds hold themselves out, with HMA and HMC's express and implied permission, as associated with HMA and HMC to sell HMA and HMC's vehicles on HMA and HMC's behalf.

75.    For instance, the Hyundai dealers that sold Class Vehicles to Plaintiffs' and the Class Members' insureds are expressly authorized by HMA and HMC to offer express warranties to purchasers of Hyundai vehicles, directly from HMA and HMC.

76.    The Hyundai dealers that sold Class Vehicles to Plaintiffs' and the Class Members' insureds were acting as HMA and HMC's agents with actual and apparent authority in selling the Class Vehicles to Plaintiffs' and the Class Members' insureds.

77.    Defendant Kia America, Inc. ("**KA**") (formerly Kia Motors America, Inc.) is a California corporation with its principal place of business at 111 Peter Canyon Rd., Irvine, CA 92606. KA engages in continuous and substantial business throughout the United States.

78.    Defendant Kia Corporation ("**KC**") is a South Korean corporation with a principal place of business in South Korea. KC is the parent corporation of KA.

79.    Defendant KA is an automobile design, manufacturing, distribution, and service corporation doing business within the United States. Furthermore, Defendant KA designs, develops, manufactures, distributes, markets, sells, leases,

LEGAL\62042293\1

warrants, services, and repairs passenger vehicles, including the Kia vehicles that are the subject of this litigation.

80. Defendant KA is the U.S. sales and marketing division of KC, which oversees sales and other operations across the United States. KA distributes Kia vehicles and sells these vehicles through its network of dealerships. Money received from the purchase or lease of a Kia vehicle from a dealership flows from the dealer to KC and KA.

81. Upon information and belief, the distribution, service, repair, installation, and decisions regarding the engines, as they relate to the defects in the Kia vehicles at issue in this action, all were performed by Defendants KA and KC.

82. Upon information and belief, Defendants KA and KC developed the post-purchase owner's manuals, warranty booklets, and other pertinent information included in maintenance recommendations and schedules for the Kia vehicles that are the subject of this action.

83. Upon information and belief, the Kia dealers that sold Class Vehicles to Plaintiffs' and Class Members' insureds hold themselves out, with KA and KC's express and implied permission, as associated with KA and KC to offer express warranties to purchasers of Kia vehicles, directly from KA and KC.

84. For instance, the Kia dealers that sold Class Vehicles to Plaintiffs' and Class Members' insureds are expressly authorized by KA and KC to offer express warranties to purchasers of Kia vehicles, directly from KA and KC.

85. The Kia dealers that sold Class Vehicles to Plaintiffs' and Class Members' insureds were acting as KA and KC's agents with actual and apparent authority in selling the Class Vehicles to Plaintiffs' and Class Members' insureds.

86. Upon information and belief, Defendant KC communicates with Defendant KA concerning virtually all aspects of the Kia products which KA and KC distribute within the United States.

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

87.   As of the end of 2021, KC's largest shareholder is HMC, which holds 33.88 percent of KC's stock.

88.   HMA and HMC are collectively referred to in this complaint as "**Hyundai**" unless identified separately.

89.   KA and KC are collectively referred to in this complaint as "**Kia**" unless identified separately.

90.   HMA, HMC, KA, and KC are collectively referred to in this complaint as "**Defendants**" unless identified separately.

## JURISDICTION AND VENUE

91.   The Court has general personal jurisdiction over Defendants because they conduct substantial business in this judicial district, and they intentionally and purposefully placed vehicles that are the subject of this action into the stream of commerce within this judicial district and elsewhere in the United States. HMA and KA maintain their principal business offices in Orange County, California.

92.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) of the Class Action Fairness Act of 2005 as the amount in controversy exceeds $5 million, exclusive of interest and costs, at least one member of the class is a citizen of a state different from each of the named defendants, and the number of members of the proposed class exceeds 100. This Court has supplemental jurisdiction over the state court claims pursuant to 28 U.S.C. §1367.

93.   This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a) as the Plaintiffs and Class Members are domiciled in a different state than all Defendants and the amount in controversy is in excess of $75,000, exclusive of interest and costs.

LEGAL\62042293\1

94. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) as all defendants do substantial business in this judicial district, including the selling of the vehicles at issue.

## FACTUAL ALLEGATIONS

### The Class Vehicles' Engines

95. The Theta II 2.0 liter and 2.4-liter engines contained in the 2011–19 Kia Optima, Sorento, and Sportage, 2011–19 Hyundai Sonata, 2014–15, 2018, 2019 Hyundai Tucson and 2013–19 Hyundai Santa Fe vehicles ("**Class Vehicles**")[1] contain either a gasoline direct injection ("**GDI**") or a gasoline multi-port injection ("**MPI**") fuel delivery system.

96. Kia advertises that "[i]t's the Gasoline Direct [GDI] engine that helps a Kia deliver outstanding performance—in both power and fuel use. GDI injects highly pressurized fuel directly into the cylinders during the engine's combustion cycle. The result is an increased quality of combustion and efficiency. By making smarter use of fuel, GDI also reduces emissions. What the driver experiences is still the most critical element of any powertrain technology. And with GDI, the driver enjoys smooth, powerful acceleration and a longer time between refueling."

97. Hyundai has also made similar public statements regarding the design of the GDI engine: "[t]his shorter, more direct path of fuel delivery, allows for greater control of the fuel mixture at the optimum moment, thus improving efficiency. The fuel is injected by a camshaft-driven, high-pressure pump that operates at pressures up to 2,175 psi. Direct injection also utilizes a higher than normal 11.3:1 compression ratio for increased power. The pistons are 'dished' to increase combustion efficiency in the cylinder. This power plant delivers best-in-class fuel economy, best-in-class four-cylinder horsepower and best-in-class torque."[2]

---

[1] Plaintiffs reserve the right to amend or add to the vehicle models and model years included in the definition of Class Vehicles after conducting discovery.

[2] https://www.hyundainews.com/en-us/releases/1311 (last visited October 14, 2022).

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

LEGAL\62042293\1

98.     The GDI Engines contained in the Class Vehicles use four reciprocating pistons to convert pressure into a rotating motion. Gasoline is mixed with air in the combustion chambers of the engine. To generate such rotating motion, a four-step sequence is used (the "**Combustion Cycle**"). First, the intake stroke begins with the inlet valve opening and a vaporized fuel mixture is pulled into the combustion chamber. Second, the compression stroke begins with the inlet valve closing and the piston beginning its movement upward, compressing the fuel mixture in the combustion chamber. Third, the power stroke begins when the spark plug ignites the fuel mixture, expanding the gases and generating power that is transmitted to the crankshaft. And fourth, the exhaust stroke begins with the exhaust valve opening and the piston moving back up, forcing the exhaust gases out of the cylinder. The exhaust valve then closes, the inlet valve opens, and the Combustion Cycle repeats itself. A diagram of the Combustion Cycle is below:



99.     The pistons are connected to the crankshaft via the connecting rod. As the connecting rod moves up and down during the Combustion Cycle, this causes the crankshaft to rotate, ultimately resulting in power to the drive wheels of the vehicle. During this cycle, the crankshaft rotates many thousands of times per minute within each connecting rod. In order to reduce friction and prolong longevity, this design utilizes a bearing placed between the connecting rod and crankshaft surfaces. As a result, the connecting rod bearings allow the crankshaft to rotate within the connecting rods during the Combustion Cycle. An exemplar

LEGAL\62042293\1

diagram of the piston, connecting rod, connecting rod bearing, and crankshaft are shown below:





Figure 3-70.—Connecting rod bearings.

100.  When the Class Vehicles are in operation, engine oil is used to lubricate the pistons, cylinder walls, connecting rod bearings, and other rotating and moving

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

components as the pistons move up and down through the four-stroke sequence. Engine oil is necessary to reduce wear on moving parts through the engine, improve sealing, and cool the engine by carrying away heat from the moving parts. Engine oil also cleans and transports contaminants away from the engine to the engine oil filter. Oil is pumped and pressurized throughout the engine by the oil pump. The oil pump draws oil from the oil pan, located underneath the piston and crankshaft. The oil pump forces engine oil through the oil filter and then through passages in the engine to properly lubricate and reduce friction in internal moving engine components. The oil then returns to the oil pan through small drainage holes located throughout the engine where it will be recirculated by the oil pump. Below is a diagram illustrating the typical path and channels of engine oil lubrication in an overhead cam engine:



101.  The connecting rod bearings are also lubricated with engine oil in order to allow the crankshaft to rotate within the connecting rods. A close-up picture of a functional connecting rod bearing is below:

**Engine Failures Within the Class Vehicles**

102.   The Class Vehicle engines experience engine fires and engine failures resulting from the following defects and malfunctions:  as a result of the Defendants' negligent and sub-standard manufacturing processes, metal debris and other contaminants remained in the engine when engine oil first was introduced into the engine. Over time, and as a result of the presence of this debris and these contaminants in the oiling system, the connecting rod bearings begin to fracture. Once the connecting rod bearings fracture, large amounts of metal debris begin to accumulate in the engine oil. Both as a result of the presence of debris on the downstream side of the oil filter, and because of the magnitude and scope of debris and contaminants which are present, further damage takes place to various engine components, resulting in dangerous, sudden, and unforeseeable engine failure, overheating and fire to the Class Vehicles.

103.   As part of the foregoing engine failure scenario, including fracture of the connecting rod bearings, the acceptable tolerances between the bearings, the



connecting rod, and the crankshaft rapidly deteriorate and become out-of-spec, dangerous and defective. Eventually, the Class Vehicles begin producing a "knocking" sound originating from the engine as a result of the deteriorated bearings. In some instances, the compromised connecting rod bearings eventually cause the piston to break through the engine block as a result of the deterioration in

LEGAL\62042293\1

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

the engine parts.  This exposes hot engine oil to hot engine parts which, with the presence of oxygen, can ignite the oil and cause an engine fire.

104.  A photograph of a fractured connecting rod bearing removed from a Class Vehicle engine is included below. As is shown in the photograph, the bearing has fractured and worn away to the point of laying flush along the inside of the



connecting rod. A large fracture is also plainly visible along the bottom left side of the bearing, as indicated by the arrow.

105.  As stated above, after the connecting rod bearings deteriorate and metal debris is circulated throughout the engine via the engine oil, damage is caused to other key engine components. The main cap—which fastens the crankshaft to the engine—can also be damaged by the metal debris in the engine oil. After the main cap is damaged, play between the main cap and engine develops, which also leads to catastrophic engine failure.

106.  As a result of these defects, the Class Vehicles suffer from restricted and inadequate engine oil lubrication. As explained above, engines are designed to have oil distributed throughout the engine through lubrication channels. When operating properly, the engine oil is distributed throughout the engine by the oil pump and then flows back to the oil pan where it is redistributed throughout the engine.

107.  In the Class Vehicles, the lubrication channels become clogged and restricted as a result of these defects, even under normal use and proper

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

25

maintenance. When the lubrication channels clog, engine oil is unable to be pumped throughout the engine (through the oil pump) and is also unable to adequately return to the oil pan, causing a condition known as oil starvation. This results in insufficient lubrication throughout the Class Vehicle's engine, which causes premature wear of the engine components and catastrophic engine failure and fire.

108.  Based on the high volume of non-collision vehicle fires, on June 11, 2018, the Center for Auto Safety petitioned NHTSA to investigate a fire-causing defect in 2011-2014 Kia Optima and Sorento, and Hyundai Sonata and Santa Fe vehicles. On July 24, 2018, the Center filed an addendum to its original petition, requesting NHTSA expand the investigation to include 2010-2015 Kia Soul vehicles.

109.  In October 2018, as reports of these fires continued to increase, the Center for Auto Safety publicly called on Defendants to recall these vehicles, saying, "Since our call for an investigation into these Kia and Hyundai non-collision fires, we have seen reports of *almost one fire every single day across these five models*." The statement went on to say, "The number and severity of these complaints, when people are simply driving their cars on the highway, is frightening. It is long past time for Kia and Hyundai to act. Car fires put everyone on the road in significant danger."

110.  The Center for Auto Safety reported that between June 12 and October 12, 2018, it learned of 103 additional fire reports, amounting to an 85% increase.

111.  While automakers occasionally produce vehicles that catch fire, when compared to these Hyundai and Kia vehicles, the Center for Auto Safety noted that there is enough of a statistical disparity to suggest a systemic issue. More specifically, in its June 7, 2018 review of all NHTSA-reported cases of non-collision fires involving similar class and size vehicles, the Center found there were 22 reported cases in competitor vehicles as opposed to 120 for the Kia and Hyundai

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

models. The June 11, 2018 Petition noted that Defendants' competitors Honda and Toyota sold 3.4 million comparable vehicles in the U.S. to Defendants' approximately 2.2 million vehicles, and that "[w]hen factoring in the number of vehicles of these types sold per manufacturer compared to the number of fire complaints, the differences are even more profound."

112.  Summarizing its findings on these five Hyundai/Kia vehicle models, the Center for Auto Safety found that as of July 23, 2018, NHTSA's VOQ database contained reports of at least:

- 39 non-collision 2011-2014 Kia Sorento fires
- 36 non-collision 2011-2014 Kia Optima fires
- 23 non-collision 2010-2015 Kia Soul Fires
- 51 non-collision 2011-2014 Hyundai Sonata fires
- 12 non-collision 2011-14 Hyundai Santa Fe fires
- **161 non-collision fires total**

113.  In November 2018, Hyundai and Kia denied U.S. Senator Bill Nelson's request that the companies' CEOs testify a hearing regarding these rampant reports of engine fires involving Defendants' vehicles. In refusing, Kia defensively responded by asking the Senate to look at non-collision vehicle fires among ***all*** automakers, saying, "To gain a full understanding of this industrywide matter, we have respectfully requested the committee consider a more comprehensive review of non-collision fires among all automakers."

114.  As the Center for Auto Safety has aptly lamented: "Until Hyundai and Kia are willing to take responsibility for the 3 million vehicles on the road that could burst into flames at any minute—with no apparent warning to the driver—we will continue to press for a recall and full and thorough investigation.  There has already been one death and a few injuries associated with these vehicle fires. How many people need to be horrifically burned before someone takes action?"

COZEN O' CONNOR
601 S. FIGUEROA STREET , SUITE 3700
LOS ANGELES, CA 90017

27

115.  These engine defects create serious safety and security issues for operators and occupants of the Class Vehicles. By way of example, the California Department of Motor Vehicles advises that stalled engines pose a significant safety risk and, as part of its safety curriculum, instructs how to properly respond to a stalled action in order to avoid further risk of injury.

116.  The National Highway Traffic Safety Administration ("**NHTSA**") takes a similar view of engine failure during vehicle operation. For instance, according to *Forbes*, in 2011 the NHTSA recalled certain Chrysler and Dodge vehicles due to "engine seizure because of connecting rod bearing failure ….Engine seizure could increase the risk of a crash."[3]

117.  Defendants failed to adequately research, design, test, and manufacture the Class Vehicles before warranting, advertising, promoting, marketing, and selling the Class Vehicles as suitable and safe for use in an intended and reasonably foreseeable manner.

### Previous Engine Recalls

118.  In or around September 10, 2015, HMA publicly recalled certain model year 2011–2012 Sonata vehicles manufactured at Hyundai Motor Manufacturing Alabama and equipped with the 2.4-liter or 2.0-liter GDI engines. (*See* Exhibit 1).

119.  According to the Hyundai GDI recall, Hyundai determined that metal debris may have been generated from factory machining operations as part of the manufacturing of the engine crankshaft during December 11, 2009 to April 12, 2012. As a result, and according to the Hyundai GDI recall:

> [i]f the debris is not completely removed from the crankshaft's oil passages, it can be forced into the connecting rod oiling passages restricting oil flow to the bearings. Since bearings are cooled by oil flow between the bearing and journal, a reduction in the flow of oil may raise bearing temperatures increasing the potential of premature bearing wear. A worn connecting rod bearing will produce a metallic, cyclic knocking noise from the

Cozen O' Connor
601 S. Figueroa Street , Suite 3700
Los Angeles, CA 90017

---

[3] https://www.forbes.com/sites/altheachang/2011/09/30/engine-problems-prompt-chrysler-recalls/?sh=38825f65575 (last visited October 13, 2022).

engine which increases in frequency as the engine rpm increases. A worn connecting rod bearing may also result in illumination of the oil pressure lamp in the instrument cluster. If the vehicle continues to be driven with a worn connecting rod bearing, the bearing can fail, and the vehicle could stall while in motion.

120.   Hyundai admitted in safety recall report SR 15V-568, that it became aware of engine-related warranty claims in the field. Furthermore, "[t]he vast majority of those claims evidenced that customers were responding to substantial noise, or the vehicle's check engine light, and bringing their vehicles to service as a result of those warnings.  Many customers also complained after the warranty was no longer available." (*Id.*)

121.   As a result, Hyundai decided to issue a safety recall for approximately 470,000 Sonata model sedans, years 2011–2012, manufactured between December 11, 2009, and April 12, 2012, at Hyundai Motor Manufacturing Alabama and equipped with either a 2.0 liter or 2.4-liter GDI engine. The recall provided notification to owners of the issue, inspection, and replacement of the engine assembly, as necessary, free of charge. Additionally, Hyundai increased the warranty for the engine sub-assembly (short block) to 10 years/120,000 miles for both original and subsequent owners.

122.   In a document filed with NHTSA, attached hereto as Exhibit 2, Kia claims the following relevant events took place regarding its knowledge of the defect:

a. **September 2015:** Kia learns of the Hyundai recall related to engine damage in 2011–2012 model year Sonata vehicles with Theta engines caused by oil blockage from debris left in engines during manufacturing at Alabama plant.

b. **January–April 2016**: Engine remanufacturer Translead conducts detailed review of all recent Kia warranty returned engines. Translead identifies oil delivery issue with Theta GDI engines (Optima, Sportage & Sorento). Low claims rate with no accidents/injuries. Decision: monitoring.

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

29

c. **May 5, 2016**: Kia learns of Hyundai Sonata warranty extension program for next two model years after recall (2013–2014 model year).

d. **May 5–25, 2016**: Kia Motors America, Inc. (now KA) analyzes field data for Theta engine vehicles. No accidents or injuries. Claims are low but have increased. Customer satisfaction identified as critical complaint factor due to high engine repair costs for vehicles out of warranty (especially used vehicle owners). Decision: extend warranty AND encourage customer repairs before breakage with one customer notice.

e. **May 25–June 10, 2016**: Kia extends warranty coverage to all 2011–2014 model year Optima owners (original and used) with 2.0L and 2.4L GDI engines to 10 years or 120,000 miles to reduce customer financial burden. Emphasis on customer opportunity to get repair done before engine breakage based on clear knocking noise developing as mutual benefit for both customer and Kia.

f. **August 24 and 29, 2016**: KA notifies owners of 2011–2014 Sportage and 2012–2014 Sorento vehicles equipped with 2.0L and 2.4L Theta GDI engines of Warranty Extension Program.

g. **October 21, 2016**: KA sees continuing costs related to VOQs [Vehicle Owner Questionnaire] and determines dealers are not approving extended warranty repairs due to customer lack of oil maintenance proof. Decision: KA advises dealers that coverage under the Extended Warranty Program does not require maintenance records.

h. **March 28, 2017**: Kia makes decision to conduct a voluntary safety recall based on anticipatory risk concerns.

123. Between approximately May 25 and June 10, 2016, KA followed Hyundai's lead and notified owners of 2011–2014 model year Optima vehicles of issues with the same connecting rod wear which results in knocking noise from the same engines. As a result, Kia provided all owners with a warranty extension on the "short block" assembly (consisting of the engine block, crankshaft, and bearings,

LEGAL\62042293\1

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

connecting rods, and bearings and pistons) for a period of 10 years starting from the date of first service or 120,000 miles. Kia also alerted owners that if the vehicles continue to be driven with a worn connecting rod bearing, the bearing can fail and may result in engine failure.

124.  Despite Kia's recall, Defendant Kia has failed to adequately repair the recalled 2011–2014 Kia Class Vehicles. Instead, the parts required to conduct the repair are typically unavailable, on nationwide backorder and/or no longer being manufactured. This has resulted in Class Members' insureds being without the use of their vehicles for weeks and/or months at a time and incurring additional and unreimbursed expense such as rental vehicles. Furthermore, when repaired, Kia often utilizes used replacement parts which fail to adequately place Class Members' insureds in the same position as prior to such engine failures.

125.  In March, April, and June 2017, Hyundai and Kia announced that they were recalling an additional 1.4 million vehicles with the GDI Engines because they received widespread reports that the engines could fail and stall, *i.e.*, the same reason for the first recall. This recall included the 2013–2014 Hyundai Santa Fe, the 2013–2014 Sonata, the 2011–2014 Kia Optima, the 2011–2013 Kia Sportage, and the 2012–2014 Kia Sorento vehicles.

126.  Defendants failed to provide either the appropriate notice to Plaintiffs' and Class Members' insureds or the appropriate and necessary repairs to the Class Vehicles containing the GDI Engines that are prone to engine failure and other safety risks.

### Defendants' Knowledge of the Engine Defect

127.  Upon information and belief, Defendants regularly monitor the NHTSA databases as part of their ongoing obligation to identify potential defects in their vehicles. NHTSA complaints establish that KA and HMA knew, or should have known, based on publicly available and internal information, of the engine defects long before the Class Vehicles at issue were sold.

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

31

128. The experiences of Plaintiffs' and Class Members' insureds are by no means isolated or outlying occurrences. Indeed, the internet is replete with examples of blogs and other websites where consumers complained of the same or similar engine defects within the Class Vehicles and complaints from earlier model year Kia and Hyundai owners and lessees with the same engines. Upon information and belief, Defendants knew, through (1) Defendants' own records of consumer complaints, (2) dealership repair records, (3) records from NHTSA, (4) warranty and post-warranty claims, (5) pre-sale durability testing and part sales, and (6) other various sources, of the engine defects. But they failed to notify consumers of the nature and extent of problems with the Class Vehicle engines or provide any adequate remedy.

129. Defendants routinely monitor the internet for complaints. KA's and HMA's customer relations departments routinely monitor the internet for customer complaints, and KA and HMA have retained the services of third parties to do the same. Further, the customer relations division regularly receives and responds to customer calls concerning, *inter alia*, product defects. Through these sources, KA and HMA were made aware of the engine defects. Responses to the complaints also indicate KA's and HMA's knowledge of the defects and their potential danger.

130. KA and HMA are experienced in the design and manufacture of consumer vehicles. As experienced manufacturers, KA and HMA conduct testing on incoming batches of components, including the Class Vehicle engines, to verify that the parts are free from defects and comply with their specifications. Accordingly, KA and HMA knew or should have known that the engines used in the Class Vehicles are defective and likely to fail prematurely, costing Plaintiffs and Class Members substantial damages and expenses.

131. Moreover, KA and HMA also should have known of the engine defect and the insufficient lubrication channels because of the sheer number of reports of engine problems relating to worn connecting rod bearings and inadequate oil

LEGAL\62042293\1

lubrication. For instance, KA's and HMA's customer relations departments, which interact with their authorized service technicians in order to identify potentially widespread vehicle problems and assist in the diagnosis of vehicle issues, have received numerous reports of engine problems relating to worn connecting rod bearings and inadequate oil lubrication. Customer relations also collects and analyzes field data including, but not limited to, repair requests made at dealerships and service centers, technical reports prepared by engineers that have reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data.

132.   KA's and HMA's warranty departments similarly review and analyze warranty data submitted by their dealerships and authorized technicians in order to identify defect trends in their vehicles. KA and HMA dictate that when a repair is made under warranty (or warranty coverage is requested), service centers must provide KA or HMA with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the broken part in case KA or HMA later determines to audit the dealership or otherwise verify the warranty repair. For their part, service centers provide significant information about in-warranty repairs to KA or HMA because KA and HMA will not pay the service centers for the repair if the complaint, cause, and correction are not sufficiently described.

133.   KA and HMA knew or should have known about the engine defects because of the high number of replacement parts ordered from them. All Kia and Hyundai service centers are required to order replacement parts, including engines, piston assemblies, and connecting rod bearings directly from KA or HMA, respectively. Other independent vehicle repair shops that service Class Vehicles also order replacement parts directly from KA or HMA. KA and HMA routinely monitor part sales reports and are responsible for actually shipping parts requested by dealerships and technicians. Thus, KA and HMA have detailed, accurate, and

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

real-time data regarding the number and frequency of replacement part orders. The sudden increase in orders for the engines and engine components used in the Class Vehicles was known to KA and HMA and should have alerted them to the scope and severity of the defects.

134.  In February 2012, KA issued a technical service bulletin ("**TSB**") to its authorized dealerships regarding an engine knocking noise. TSBs are documents used by automotive manufacturers to inform dealership technicians about new information, including vehicle problems, new repair procedures, and improved parts. In TSB No. ENG114R1, KA acknowledged that the earlier model years of the Class Vehicles with identical engines were defective and experienced a "knocking noise." As a result, KA directed dealers to blame the engine defect on the use of aftermarket oil filters and instructed the dealers to replace the aftermarket oil filter with a genuine Kia oil filter. The TSB also explained that this "repair" is not covered under warranty. KA has failed to provide any post-sale notification to owners and lessees regarding the use of only genuine Kia oil filters in the Kia Class Vehicles. Instead, KA attempted to circumvent warranty obligations related to the engine defect by faulting customers for use of an aftermarket oil filter.

135.  HMA issued a similar TSB to its authorized dealerships in September 2012. In TSB No. 12-EM-006, HMA acknowledged that the earlier model years of the Class Vehicles with identical engines were defective and experienced a "knocking noise." As a result, HMA directed dealers to blame the engine defect on the use of aftermarket oil filters and instructed the dealers to replace the aftermarket oil filter with a genuine Hyundai oil filter. The TSB also explained that this "repair" is not covered under warranty. HMA has failed to provide any post-sale notification to owners and lessees regarding the use of only genuine Hyundai oil filters in the Hyundai Class Vehicles. Instead, HMA attempted to circumvent

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

warranty obligations related to the engine defect by faulting customers for use of an aftermarket oil filter.[4]

136. The compromised connecting rod bearings and oil lubrication channels are not, however, caused by the use of an aftermarket engine oil filter. Despite KA's and HMA's knowledge of this fact, KA and HMA did not inform Plaintiffs, Class Members, or their insureds of the true cause of the prematurely worn connecting rod bearings and insufficient oil lubrication channels.

137. NHTSA complaints establish that Defendants knew, or should have known, of the defects before the Class Vehicles at issue in this action were sold. Upon information and belief, Defendants became aware of the engine defects earlier than August 25, 2013 (as early as 2011) through: (1) Defendants' own records of customers' complaints, (2) dealership repair records, (3) records from NHTSA, (4) warranty and post-warranty claims, (5) pre-sale durability testing and part sales, and (6) other various sources. Indeed, because HMC owns approximately one-third of KC's stock, the two regularly communicate about parts in common between their vehicles and suspected defects in these vehicles, including communicating regarding potential defects in the Class Vehicle engines. Thus, when HMA became aware of the defective engines, KA also became aware of them.

138. According to Reuters, Kim Gwang-ho, then an employee on Hyundai's Quality Strategy team, traveled to Washington D.C. in August 2016 to inform NHTSA that more vehicles should have been recalled over the defects described herein. He also reported several safety issues to NHTSA authorities.[5]

139. Mr. Kim reported to Reuters that he provided NHTSA with 250 pages of internal documents related to the alleged engine defect, which he described as a

---

[4] In May 2018, the Federal Trade Commission warned Hyundai that this practice was unlawful. *See* https://www.caranddriver.com/news/a20633359/ftc-warning-to-hyundai-is-a-reminder-to-consumers-know-your-warranty-rights/ (last visited Oct. 13, 2022).
[5] https://www.reuters.com/article/us-hyundai-whistleblower/blowing-the-whistle-in-south-korea-hyundai-man-takes-on-chaebol-culture-idUSKCN18B0J5 (last visited Oct. 14, 2022).

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

LEGAL\62042293\1

design defect instead of a manufacturing error. Citing an internal report from Hyundai's Quality Strategy team, Mr. Kim reported that "the problem was not just with the manufacturing process but also engine design, meaning Hyundai would need to fix engines in all the affected cars, at a steep cost."

140.  Kim also attempted to provide those documents directly to Reuters, but Hyundai obtained an injunction that prevented Reuters from obtaining the documents.

***Pre-Sale Durability Testing***

141.  Defendants are experienced in the design and manufacture of consumer vehicles. As experienced manufacturers, Defendants conduct tests, including pre-sale durability testing, on incoming components, including the engines, to verify the parts are free from defects and align with Defendants' specifications.

142.  Kia states, as part of its promotional materials describing the engines, that it conducts expansive presale durability testing on its vehicles to make sure they "endure over a long time without fault."[6] Kia claims this presale testing includes seven different types of durability tests: (1) an item durability test; (2) a module durability test; (3) a Belgian road test; (4) a high-speed test; (5) a corrosion test; (6) a P/T test; and (7) a vehicle test. Kia also states that it conducts these tests "in extreme weather conditions including desert with blazing sunlight and coldness of 40 degrees below zero."

143.  Specifically, regarding testing its engines, Kia states that it puts "our engines through rigorous testing in the highest, hottest, and coldest places that a car can possibly be before we use them in our cars."

144.  In addition, Kia represents that it conducts extensive "driving test[s]" in which it puts "our cars to endurance test under diverse harsh conditions that can be encountered on Earth" because "[a]ny fault in your car can affect your safety." Kia

---

[6] https://www.kia.com/fj/experience/innovation-story/performance.Theta.html (last visited Oct. 13, 2022).

expands on six different road tests that it conducts, including a durability test on a road "so rough that driving around 10,000 miles on it gives the same effect of driving around 60,000 on regular roads. Cars that survive the test only can be presented to consumers."

145. In addition, John Juriga, the Director of Powertrain at Kia in 2015, stated that Kia's validation testing is among the toughest in the automotive industry.[7] Among other things, Kia claims this validation testing runs the engine at maximum throttle (the maximum speed the engine can operate under) while under full load "so we're stressing the components as much as possible and we run it virtually nonstop for 300 hours." Afterwards, Kia claims that it does an "overrun spec" where it runs it over spec for 10–20 hours to make sure it can survive past the red line limits in order to "make sure these products stay durable in the customers' hands."

146. Moreover, Kia states that it uses "the most extreme and rigorous vehicle testing program ever devised by the company." As part of this test, Kia simulates stop-and-go driving repeated over several times to "put additional strain on the engine, transmission and HVAC systems and eliminate any possible flaws." In addition, at its Mojave Proving Grounds test site, Kia utilizes a "high-speed oval, gravel off-road tracks, high-vibration road surfaces, brake test facilities and different gradients. These each enable engineers to evaluate and refine the ride, handling, brakes and NVH of prototype and production vehicles."

147. Hyundai also represents that it conducts a "brutal amount of testing" on its vehicles, including "everything from pushing the engine in triple-digit heat and subzero arctic conditions to crashing over 100 cars to ensure every measure of safety before production of the car even begins."[8]

---

[7] https://www.youtube.com/watch?v=GNPB3RtHN2M (last visited Oct. 13, 2022).
[8] *See, e.g.*, https://www.easternshorehyundai.com/hyundai-quality-and-workmanship/ (last visited Oct. 14, 2022).

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

148.  As a result, Defendants must have been well aware of the engine defects prior to the Class Vehicles being sold to Plaintiffs' and Class Members' insureds.

**Defendants' Warranty-Related Practices**

### a. Kia

149.  KA issued two relevant warranties with each Kia Class Vehicle: a "New Vehicle Limited Warranty," and a "Powertrain Warranty."

150.  Under the basic New Vehicle Limited Warranty, KA agreed to repair defects reported within the earlier of 5 years or 60,000 miles.

151.  Under the Powertrain Warranty, KA agreed to repair defects affecting various powertrain components through 10 years and 100,000 miles. According to the Warranty and Consumer Information Manual, Powertrain Coverage Components include:

> **In the Engine:** Cylinder block, cylinder head and all internal parts, timing gear, seals and gaskets, valve cover, flywheel, oil pump, water pump and turbo charger.
>
> **In the Transaxle:** Transmission case and all internal parts, torque converter, drive shafts, universal joints, front hubs, bearings, seals and gaskets.
>
> **In the Transmission:** Transmission case, transfer case, torque converter and all internal parts, seals, and gaskets.[9]

152.  KA instructs vehicle owners and lessees to bring their vehicles to a Kia dealership for the warranty repairs. Many owners and lessees have presented Kia Class Vehicles to Kia dealerships with complaints related to the engine defect. In addition to the above warranties, KA has also issued a 10 year/120,000-mile warranty on the short blocks contained in all 2011–2014 Kia Class Vehicles.

---

[9] https://www.kia.com/us/content/dam/kia/us/en/images/warranty/manual/general-warranty-and-consumer-info/2014_warranty.pdf (last visited Oct. 13, 2022).

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

LEGAL\62042293\1

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

153.  KA has evaded its warranty obligations by failing to tell consumers that their vehicles are defective and by representing that the cause of the defects is the owner's neglect to properly maintain the engine oil and/or engine oil level. This representation, however, is false as the engine is inherently defective and will inevitably fail. *See* Exhibit 2 ("October 21, 2016 – [KA] sees continuing cost related VOQs [Vehicle Owner Questionnaire] and determines dealers are not approving extended warranty repairs due to customer lack of oil maintenance proof").

154.  In addition, KA has also evaded its warranty obligations by requiring consumers to produce the entire maintenance history of the Kia Class Vehicles, including a mandate that all oil changes be completed at a Kia dealership, before determining whether to make the necessary repairs under warranty. KA, however, knows that the defect in the Kia Class Vehicles' engines manifests even if the owner or lessee has followed Kia's oil change guidelines. Even if consumers produce their vehicles' maintenance history, KA blames the defects and engine failure on the consumer, refuses to cover the necessary repairs under warranty, and charges as much as $10,000 to repair/replace the engine.

155.  Kia also advertises that it offers "an industry-leading Kia 10-year or 100,000-mile warranty program." With respect to the powertrain warranty, however, Kia publicizes the existence of 10 year/100,000-mile powertrain warranty but fails to mention that subsequent owners only receive powertrain warranty coverage for 5 years/60,000 miles. As such, subsequent owners are left to discover the limited warranty coverage after purchasing their vehicle. Kia's failure to cover repairs under the powertrain warranty between 5 years/60,000 miles and 10 years/100,000 miles is therefore unconscionable and the warranty reduction should

be unenforceable. A typical Kia advertisement touting its warranty is pictured

below:

156.  In many instances, consumers and their insurers have incurred and will



continue to incur expenses for the diagnosis of the defects (despite such defects

having been contained in the Kia Class Vehicles when manufactured by Kia),

repair and replacement of the engine and the unnecessary and premature

replacement of the connecting rods, crank shaft, oil pump, and other engine

components.

157.  Furthermore, a number of Class Members whose insureds presented

their Kia Class Vehicles to Kia dealerships because of issues related to the

damaged connecting rod bearings and insufficient engine oil lubrication channels

were denied warranty repairs and, instead, were informed that nothing was wrong

with their vehicles. As a result, after expiration of the warranty period, Class

Members are forced to pay costly repairs to correct the defect.

### b.  Hyundai

158.  HMA also issued two relevant warranties with each Hyundai Class

Vehicle: a "New Vehicle Limited Warranty," and a "Powertrain Warranty." Under

the basic New Vehicle Limited Warranty, HMA agreed to repair defects reported

within the earlier of 5 years or 60,000 miles.

159.  Under the Powertrain Warranty, HMA agreed to repair defects

affecting various powertrain components through 10 years or 100,000 miles.

LEGAL\62042293\1

According to the Warranty and Consumer Information Manual, Powertrain Coverage Components include:

**ENGINE**

Cylinder block/head and all internal parts, manifolds, timing gears, timing chain, timing cover, gaskets and seals, oil pump, water pump, fly-wheel, oil pan assembly, rocker cover and engine mounts, and turbocharger.

**TRANSMISSION/TRANSAXLE**

Case and all internal parts, axle shafts (front/rear), constant velocity joints, front/rear hub bearings, propeller shafts, seals and gaskets, torque converter and converter housing and clutch cover and housing, transfer case for Santa Fe, Tucson, and Veracruz . . . .

160. HMA instructs vehicle owners and lessees to bring their vehicles to a Hyundai dealership for the warranty repairs. Many owners and lessees have presented Hyundai Class Vehicles to Hyundai dealerships with complaints related to the engine defect.

161. HMA has evaded its warranty obligations by failing to tell consumers that their vehicles are defective and by representing that the cause of the defects is the owner's neglect to properly maintain the engine oil and/or engine oil level. This representation, however, is false as the engine is inherently defective.

162. In addition, Hyundai has also evaded its warranty obligations by requiring consumers to produce the entire maintenance history of the Hyundai Class Vehicles, and by including a mandate that all oil changes be completed at a Hyundai dealership, before even determining whether to make the necessary repairs under warranty. Hyundai, however, knows that the defects in the Hyundai Class Vehicles' engines manifest themselves even if the owner or lessee has followed Hyundai's oil change guidelines. Even if consumers produce their vehicles' maintenance history, Hyundai blames the defect and engine failure on the consumer, refuses to cover the necessary repairs under warranty, and charges as much as $10,000 to repair the engine.

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

163.  Hyundai also advertises that it offers "America's Best Warranty." With respect to the powertrain warranty, however, Hyundai publicizes the existence of a 10 year/100,000-mile powertrain warranty but fails to mention that subsequent owners only receive powertrain warranty coverage for 5 years/60,000 miles. As such, subsequent owners are left to discover the limited warranty coverage after purchasing their vehicle. Hyundai's failure to cover repairs under the powertrain warranty between 5 years/60,000 miles and 10 years/100,000 miles is therefore unconscionable and the warranty limitation is unenforceable. A typical Hyundai advertisement touting "America's Best Warranty" is pictured below:



AMERICA'S BEST WARRANTY
* 10-year/100,000-mile Powertrain
  Limited Warranty
* Lifetime Hybrid Battery Warranty

164.  In many instances, consumers have incurred and will continue to incur expenses for the diagnosis of the defect, despite such defect having been contained in the Hyundai Class Vehicles when manufactured by Hyundai, repair and replacement of the engine and the unnecessary and premature replacement of the connecting rods, crank shaft, oil pump, and other engine components.

165.  Furthermore, a number of Plaintiffs' and Class Members' insureds who presented their Hyundai Class Vehicles to Hyundai dealerships because of issues related to the damaged connecting rod bearings and insufficient engine oil lubrication channels were denied warranty repairs and, instead, were informed that nothing was wrong with their vehicles. As a result, after expiration of the warranty period, Class Members were forced to pay costly repairs to correct the defects.

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

## THE NAMED CLASS REPRESENTATIVES' CURRENT SUBROGATION CLAIMS

166.  Plaintiffs and the Class Members issue policies of automobile and property insurance.

167.  The engine defects described herein caused damage to the personal property of Plaintiffs' and Class Members' insureds. As a result, Plaintiffs' and Class Members' insureds made claims to Plaintiffs and Class Members pursuant to their automobile and property insurance policies.

168.  Pursuant to such claims, Plaintiffs and Class Members incurred adjustment expenses, and subsequently made payments to compensate their insureds for their property damage, including the loss of use thereof, which expenses and payments are in excess of $5,000,000.

169.  By virtue of their payments to their insureds and to the extent thereof, Plaintiffs and Class Members are now legally, equitably, and contractually subrogated to the claims of their insureds against all responsible third parties, including the defendants herein.

## CLASS ACTION ALLEGATIONS

170.  Plaintiffs bring this action both individually and as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) against Defendants.

171.  The Class consists of: during the fullest period allowed by law, all insurance companies that issued automobile and property insurance policies, whose insureds purchased or leased a Class Vehicle and suffered a loss resulting from the Class Vehicles' engine defects, and there has been one or more payments made on a related insurance claim.

172.  The Class is limited to the time period beginning on the date established by the Court's determination of any applicable statute of limitation,

after consideration of any tolling and accrual issues, whichever is earlier, and ending on the date of the entry of judgment.

173.  Excluded from the class are (1) Defendants, their officers, directors, and employees, and (2) all insurers which execute and timely file a request for exclusion from the class. Plaintiffs reserve the right to modify, change, or expand the class definitions based on discovery and further investigation.

174.  **Numerosity**: While the exact number and identities of individual members cannot be determined yet, the class consists of a number of property and automobile insurers having insureds in the hundreds, if not thousands, who have suffered or will suffer loss as a result of the failure of the Class Vehicles.

175.  The number of Class Members with insureds who have or will suffer such losses is so numerous that joinder of all members is impracticable.

176.  **Commonality**:  Common questions of law and fact exist as to all Class Members. Among the common questions of law and fact are:

    a.  whether the Class Vehicles were sold with a defect;

    b.  whether the defect is a safety defect;

    c.  whether the Defendants intentionally placed the Class Vehicles into the stream of commerce with actual knowledge that the vehicles pose an unreasonable safety risk;

    d.  whether a reasonable consumer would consider the defect or its consequences to be material;

    e.  whether Defendants should have made pre-sale disclosure of the existence of the defect;

    f.  whether Plaintiffs and Class Members are entitled to relief;

    g.  Whether the corrective action/recall undertaken by the Defendants was sufficient;

    h.  whether the design and/or manufacture of the vehicles is defective and unreasonably dangerous.

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

177.  **Typicality**: Plaintiffs have substantially the same interest in this matter as all other members of the class and Plaintiffs' claims arise out of the same set of facts and conduct as those of all other members of the class. Plaintiffs and all Class Members are insurance companies which issued automobile and property insurance policies to policyholders who owned or leased Class Vehicles manufactured and sold by Defendants. The insurance claims received and to be made under policies issued by members of the class all satisfy the typicality requirement in that each of these claims will have had an identical cause, namely, a loss due to the engine defects. Thus, the insurance claims of the named Class Members are typical of the claims covered and paid by all members of the class.

178.  **Adequacy of Representation**:  Plaintiffs are committed to pursuing this action and has retained competent counsel. Counsel for Plaintiffs has the largest subrogation practice in the United States, specializing in fire and property damage litigation, having represented thousands of insurance companies in tens of thousands of fire damage cases since the founding of the firm in 1970. Counsel for Plaintiffs is also experienced in complex litigation, including MDL litigation and class action litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Plaintiffs' claims are coincident with, and not antagonistic to, those of other Class Members they seek to represent. Plaintiffs have no disabling conflicts with members of the Class, and they will fairly and adequately represent the interests of the other Class Members.

179.  **Superiority:** The elements of Rule 23(b)(3) are met. The common questions of law and fact enumerated above predominate over the questions affecting only individual members of the Class and a class action is the superior method for the fair and efficient adjudication of the controversy. The likelihood that all individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. The cost to litigate separate and individual cases against the Defendants makes it cost prohibitive for

COZEN O´ CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

most insurers to separately litigate their claims against Defendants. Serial adjudication in numerous venues is not efficient, timely or proper. Judicial resources throughout California and the United States will be unnecessarily depleted by litigation of individual claims. Individualized rulings and judgments have and will result in inconsistent relief for similarly situated plaintiffs. Plaintiffs' counsel, highly experienced in class action and product liability litigation, foresees little difficulty in the management of this case as a class action. Indeed, the only way to ensure that the serious misconduct and safety risks alleged herein are remedied is through a collective action on behalf of insurers insuring property in the United States.

180.  Plaintiffs' claims are materially the same under the laws of California as in all states in the United States. In the event that California law does not apply on a nationwide basis, Plaintiffs will seek to apply the laws of the various states and the District of Columbia as will be addressed in Plaintiffs' brief in support of class certification.

181.  The nature of notice to the proposed class is as follows:

Notice to the proposed class easily will be accomplished in that each member of the class is a property and casualty insurance company, doing business within the United States, many of whom already are represented by Plaintiffs' counsel in other insurance litigation matters, and all of whom are readily able to be notified of all matters pertaining to the proposed class.

## COUNT I
## BREACH OF IMPLIED WARRANTY
## (INDIVIDUALLY AND ON BEHALF OF THE CLASS)

182.  Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

LEGAL\62042293\1

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

183.  Defendants were at all relevant times the designer, manufacturer, distributor, warrantor, and seller of the Class Vehicles. Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased.

184.  Defendants provided Plaintiffs' and the other Class Members' insureds with an implied warranty that the Class Vehicles and any parts thereof were merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because, *inter alia,* the Class Vehicles and their engines suffered from a failure to evacuate all metal shavings from the engine oil passages during the production process and insufficient engine oil lubrication channels at the time of sale that causes the vehicles to experience premature and catastrophic engine failure. Therefore, the Class Vehicles are not fit for their particular purpose of providing safe and reliable transportation.

185.  Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines which were designed, manufactured, supplied, distributed, and sold by Defendants were safe and reliable for providing transportation and would not experience premature and catastrophic engine failure; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated in a reasonably foreseeable manner.

186.  Defendants' warranties were designed and intended for the benefit of the Plaintiffs' and Class Members' insureds as ultimate consumers of the Class Vehicles.

187.  Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs' and the other Class Members' insureds

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

with reliable, durable, and safe transportation. Instead, the Class Vehicles suffer from defective design(s) and manufacturing defect(s).

188.  Defendants' actions and omissions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

189.  As a direct and proximate result of Defendants' breach of the implied warranties of merchantability and fitness, Plaintiffs, Class Members and their insureds suffered property damage, including the loss of use thereof, and other damages for which the Defendants, and each of them, are liable.

**COUNT II**
**BREACH OF WARRANTY UNDER THE**
**MAGNUSON-MOSS WARRANTY ACT**
**15 U.S.C. § 2301, ET SEQ.**

190.  Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

191.  Plaintiffs and the Class stand in the shoes of their insureds who are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

192.  Defendants are suppliers and warrantors within the meaning of 15 U.S.C. §§ 2301(4)-(5).

193.  The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. §2301(1).

194.  Defendants' 5 year/60,000 miles Basic Warranty and 10 year/100,000 miles Powertrain Warranty are "written warranties" within the meaning of 15 U.S.C. § 2301(6).

195.  Defendants breached the express warranties by:

      a.      Providing a 5 year/60,000 miles Basic Warranty and a 10 year/100,000 miles Powertrain Warranty with the purchase or lease of the Class Vehicles, thereby warranting to repair or

Cozen O'Connor
601 S. Figueroa Street, Suite 3700
Los Angeles, CA 90017

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

replace any part defective in material or workmanship at no cost to the owner or lessee;

b. Selling and leasing Class Vehicles with engines that were defective in design, materials and workmanship, requiring repair or replacement within the warranty period and doing so with knowledge of the defects; and

c. Refusing and failing to honor their express warranties by repairing or replacing, free of charge, the engine or any of its component parts in order to remedy the prematurely worn connecting rod bearings and insufficient engine oil lubrication channels.

196. Plaintiffs' and the other Class Members' insureds relied on the existence and length of the express warranties in deciding whether to purchase or lease the Class Vehicles.

197. Defendants provided Plaintiffs' and the other Class Members' insureds with an implied warranty that the Class Vehicles and any parts thereof are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because, *inter alia,* the Class Vehicles and their engines suffered from a failure to evacuate all metal shavings from the engine oil passages during the production process and insufficient engine oil lubrication channels at the time of sale that causes the vehicles to experience premature and catastrophic engine failure. Therefore, the Class Vehicles are not fit for their particular purpose of providing safe and reliable transportation while being operated in a reasonably foreseeable manner.

198. Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines which were

designed, manufactured, supplied, distributed, and sold by Defendants were safe and reliable for providing transportation and would not experience premature and catastrophic engine failure; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated in a reasonably foreseeable manner.

199.  Defendants' warranties were designed and intended for the benefit of the Plaintiffs' and Class Members' insureds as ultimate consumers of the Class Vehicles.

200.  Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs' and the other Class Members' insureds with reliable, durable, and safe transportation. Instead, the Class Vehicles suffer from defective design(s) and manufacturing defect(s).

201.  Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for their ordinary use.

202.  Defendants' breach of the express and implied warranties has deprived Plaintiffs' and the other Class Members' insureds of the benefit of their bargain.

203.  The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25.00. In addition, the amount in controversy meets or exceeds the sum or value of $50,000.00 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

204.  Plaintiffs, on behalf of themselves and the class, afforded the Defendants notice and a reasonable opportunity to cure their breach of the written warranties via a written letter, but Plaintiffs and the other Class Members were not required to do so because affording Defendants a reasonable opportunity to cure their breach of written warranties would have been futile. Defendants were also on notice of the alleged defect from the complaints and service requests it received

LEGAL\62042293\1

from consumers, including through NHTSA, as well as from their own warranty claims, customer complaint data, and parts sales data.

205.  As a direct and proximate result of Defendants' breach of the above-referenced warranties, Plaintiffs, Class Members and their insureds suffered property damage, including the loss of use thereof, and sustained damages, including property damage, loss of use damage, consequential damages, diminution in value, and costs, for which the Defendants, and each of them, are liable, together with statutory attorney's fees and other relief which the Court deems to be just and appropriate.

**COUNT III**
**NEGLIGENT MISREPRESENTATION**
**(INDIVIDUALLY AND ON BEHALF OF THE CLASS)**

206.  Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

207.  Defendants made representations to Plaintiffs' and Class Members' insureds concerning the safety and quality of the Class Vehicles that were not true. Some of those representations, but not all, are described in preceding paragraphs.

208.  Defendants had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs' and Class Members' insureds rely on the misrepresentations.

209.  Plaintiffs' and Class Members' insureds reasonably relied on Defendants' representations and, as a direct and proximate result thereof, Plaintiffs, Class Members and their insureds suffered property damage, including the loss of use thereof, and other damages, for which the Defendants, and each of them, are liable.

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

LEGAL\62042293\1

## **COUNT IV**
## **NEGLIGENT FAILURE TO WARN**
## **(INDIVIDUALLY AND ON BEHALF OF THE CLASS)**

210.  Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

211.  Defendants designed, manufactured, distributed, and sold the Class Vehicles.

212.  The Class Vehicles sold to Plaintiffs' and Class Members' insureds:

    A.    were not merchantable;

    B.    were not reasonably suited for the intended use for which they were sold; and

    C.    were in a defective and unreasonably dangerous condition at the time of sale, by reason of the design and manufacture of the Class Vehicles.

213.  Defendants owed the Plaintiffs' and Class Members' insureds a duty to warn with respect to dangers and risks associated with the ordinary and foreseeable use of the Class Vehicles, particularly when such risks arose from latent and hidden defects of design that could not be detected by the Plaintiffs' and Class Members' insureds in the exercise of reasonable care.

214.  At all relevant times, including at the time of sale, Defendants knew that the Class Vehicles were defective and unreasonably dangerous, a risk to the safety of consumers and the public, and created a risk of property damage and loss.

215.  Defendants breached their duty owed to the Plaintiffs' and Class Members' insureds by completely failing to provide them with any warnings with respect to the dangers and risks of the engine defects and harm to consumers, the public, and property directly resulting from the design and manufacture of the Class Vehicles, including the engine defects.

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

LEGAL\62042293\1

216. The failure to warn Plaintiffs' and Class Members' insureds of the dangers and risks caused by the engine defects were unreasonable, and Defendants' failure to warn was the result of a lack of due care and ordinary diligence.

217. Defendants' failure to warn Plaintiffs' and Class Members' insureds regarding the defective and unreasonably dangerous condition of the Class Vehicles proximately caused damage to the Plaintiffs' and Class Members' insureds resulting from engine fire and engine failure.

218. Defendants are liable in tort for their negligent failure to warn which resulted in the damages caused by the Class Vehicles.

219. Defendants owe a duty to consumers not to sell dangerous products that create severe risks of property damage and harm to the safety of consumers and the public, and to warn consumers of such risks. This duty arises under applicable law and is independent of any contractual obligation.

220. As a direct and proximate result of Defendants' aforesaid negligent failure to warn, Plaintiffs, Class Members and their insureds suffered property damage, including the loss of use thereof, and other damages for which the Defendants, and each of them, are liable.

**COUNT V**
**UNJUST ENRICHMENT**
**(INDIVIDUALLY AND ON BEHALF OF THE CLASS)**

221. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein. This count is pled in the alternative to the contract-based claims.

222. Plaintiffs' and Class Members' insureds conferred a monetary benefit on Defendants when they purchased or leased the Class Vehicles.

223. Defendants had knowledge that this benefit was conferred upon them.

224. Defendants charged and received from the Plaintiffs' and Class Members' insureds the benefit of a higher price for the Class Vehicles than the

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

vehicles' value in light of the engine defects, Defendants' failure to honor warranties, and Defendants' wrongful acts and omissions.

225.  Defendants have been and continue to be unjustly enriched at the expense of Plaintiffs and the Class Members, and Defendants' retention of this benefit under the circumstances would be inequitable.

226.  Plaintiffs and the Class Members seek all available equitable relief, including but not limited to restitution, in the amount of the benefit conferred on Defendants as a result of their wrongful conduct.

## COUNT VI
## NEGLIGENCE
## (INDIVIDUALLY AND ON BEHALF OF THE CLASS)

227.  Plaintiffs and Class Members incorporate by reference each preceding and succeeding paragraph as if fully set forth at length herein.

228.  Defendants designed, manufactured, distributed and sold the Class Vehicles.

229.  Defendants violated 49 CFR Part 573 and applicable industry standards and otherwise failed to exercise reasonable care in connection with their design, manufacture, distribution and sale of the Class Vehicles.

230.  Defendants' violation of their duties under applicable law included their failure to design and manufacture their vehicles without defective and unreasonably dangerous conditions which combined to cause engine failures and engine fires, as a result whereof Plaintiffs, Class Members and their insureds suffered property damage, including the loss of use thereof, for which the Defendants, and each of them, are liable.

## COUNT VII
## FRAUD
## (INDIVIDUALLY AND ON BEHALF OF THE CLASS)

231.  Plaintiffs and Class Members incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

54

232.  Defendants, by virtue of their deceptive trade practices and otherwise unlawful behavior, all of which is set forth in detail herein, defrauded Plaintiffs' and Class Members' insureds.  Defendants' fraudulent course of conduct is ongoing and continues to this day.  Such acts of fraud include all unlawful behavior set forth in detail herein, including Defendants' fraudulent concealment and material misrepresentations regarding the dangerous and defective condition of their vehicles, which were manufactured in violation of applicable industry standards.

233.  Defendants intentionally misrepresented and concealed the engine defects and related safety hazards and acted with reckless disregard for the truth and denied the Plaintiffs' and class members' insureds information that is relevant to their purchasing decision. Defendants knew their representations were false when made. Upon information and belief, Defendants became aware of the engine defects earlier than August 25, 2013 (as early as 2011) through: (1) Defendants' own records of customers' complaints, (2) dealership repair records, (3) records from NHTSA, (4) warranty and post-warranty claims, (5) pre-sale durability testing and part sales, and (6) other various sources. Indeed, because HMC owns approximately one-third of KC's stock, the two regularly communicate about parts in common between their vehicles and suspected defects in these vehicles, including communicating regarding potential defects in the Class Vehicles' engines. Thus, when HMA became aware of the defective engines, KA also became aware of them.

234.  Defendants made material omissions concerning presently existing or past material facts. For example, Defendants did not fully and truthfully disclose to their customers the true nature of the inherent defects with the Class Vehicles' engines, which was not readily discoverable by consumers until years after purchase, often after the New Vehicle Limited Warranty or the Powertrain Warranty had expired. As a result, Plaintiffs' and the other class members' insureds

LEGAL\62042293\1

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

were fraudulently induced to lease and purchase the Class Vehicles with said defect and all of the resultant problems.

235. Defendants' misrepresentations included, but were not limited to, the following:

A.   Defendants misrepresented the quality of the Class Vehicles' engines, as well as the nature and extent of the problems with the Class Vehicles' engines, or provide any adequate remedy or guidance regarding the flawed engines and instead elected to mislead consumers regarding the existence, nature, and appropriate repair for Defendants' defective engines long after Defendants were aware of such defects.

B.   HMA directed dealers to blame the engine defect on the use of aftermarket oil filters, for example, yet failed to provide any post-sale notification to owners and lessees regarding the use of only genuine Hyundai oil filters in the Hyundai Class Vehicles. This was part of an effort by HMA to mislead consumers and circumvent warranty obligations related to the engine defect by faulting customers for use of an aftermarket oil filter.

C.   Kia made false claims about the nature and quality of its vehicle testing program while knowing its vehicles were susceptible to engine failure due to defects Kia knew about, but elected to conceal. Kia falsely claimed that it conducted expansive presale durability testing on its vehicles, for example, claiming that they sure Kia engines "endure over a long time without fault." Kia also claimed that it conducted rigorous testing, including testing performed at an "overrun spec" where it runs its vehicles "over spec" for 10–20 hours to make sure it can survive past the red line limits in order to "make sure these products stay durable in

LEGAL\62042293\1

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

the customers' hands." In reality, however, Kia knows, and knew when it made those statements, that its engines were flawed and susceptible to engine failure due to normal routine use due to defects in the engines.

236. Kia claimed that it used "the most extreme and rigorous vehicle testing program ever devised by the company." As part of this test, Kia claimed that it simulated stop-and-go driving to "put additional strain on the engine, transmission and HVAC systems and eliminate any possible flaws." While making these representations, on information and belief, Kia was aware of serious engine defects, including the true cause of engine failures in its vehicles. In addition, Kia claimed that at its Mojave Proving Grounds test site, Kia utilized a "high-speed oval, gravel off-road tracks, high-vibration road surfaces, brake test facilities and different gradients. These each enable engineers to evaluate and refine the ride, handling, brakes and NVH of prototype and production vehicles." Yet Kia, on information and belief, concealed known engine defects contrary to these assertions, thus misrepresenting the nature and quality of its engines.

A. Hyundai also represented that it conducts a "brutal amount of testing" on its vehicles, including "everything from pushing the engine in triple-digit heat and subzero arctic conditions to crashing over 100 cars to ensure every measure of safety before production of the car even begins", all the while concealing known defects from customers that would obviously have been revealed by such testing.

B. As set forth in greater detail above, Hyundai knowingly blamed the defect and engine failures on the consumer, when the true cause and origin of the defect and engine failures were known to it, or should have been known to it if it was actually conducting rigorous testing and analysis.

Cozen O' Connor
601 S. Figueroa Street, Suite 3700
Los Angeles, CA 90017

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

C.    HMA instructed vehicle owners and lessees to bring their vehicles to a Hyundai dealership for the warranty repairs, but then misled those same consumers about the true cause and origin of engine defects and failures.

D.    Hyundai falsely represented to consumers that the cause of engine defects was the owner's neglect to properly maintain the engine oil and engine oil level. Consumers who presented their Hyundai Class Vehicles to Hyundai dealerships because of issues related to the damaged connecting rod bearings and insufficient engine oil lubrication channels, for example, were denied warranty repairs and, instead, falsely informed that nothing was wrong with their vehicles;

E.    Similarly, Class Members whose insureds presented their Kia Class Vehicles to Kia dealerships because of issues related to the damaged connecting rod bearings and insufficient engine oil lubrication channels were denied warranty repairs and, instead, informed that nothing was wrong with their vehicles.

F.    KA also told consumers that the cause of the defects was the owner's neglect to properly maintain the engine oil and engine oil level. This representation, however, was false as the engine is inherently defective and will inevitably fail.  On information and belief, KA knew this representation was false when made.

237.  Defendants had a duty to disclose that the Class Vehicles contain defects, were unsafe, and continue to be unsafe, because details of the defects were known and accessible only to Defendants. Whether a vehicle is safe and reliable or contains defects are material concerns to a consumer. Moreover, Defendants knew these details were not known or reasonably discoverable by Plaintiffs' and the class members' insureds.

LEGAL\62042293\1

238.   These affirmative misrepresentations and omissions were made by Defendants with knowledge of their falsity, and with the intent that Plaintiffs, class members, and their insureds would rely on these same misrepresentations and omissions.

239.   Plaintiffs and the class members' insureds reasonably relied on Defendants' statements, and omissions, and suffered damages as a result.

240.   Because of the Defendants' misrepresentations, concealment, and omission of material facts, Plaintiffs and the Class have been injured and sustained damage, including but not limited to the costs to repair/replace the vehicles.

241.   Defendants' fraudulent conduct caused property damage and loss of use thereof, together with other damages to Plaintiffs, Class Members and their insureds, for which Defendants, and each of them, are liable.

242.   Plaintiffs and the class members seek all compensatory damages, restitution, incidental and consequential damages, and other damages allowed by law.

**COUNT VIII**
**VIOLATIONS OF CONSUMERS LEGAL REMEDIES ACT**
**CAL. CIV. CODE § 1750, *ET SEQ.***
**(INDIVIDUALLY AND ON BEHALF OF THE CLASS)**

243.   Plaintiffs and the Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

244.   The California Consumers Legal Remedies Act, Cal. Civil Code § 1750 *et seq*. ("**CLRA**") prohibits "unfair or deceptive acts or practices."

245.   The CLRA applies to Defendants' actions and conduct described herein because it extends to the sale of goods or services for personal, family, or household use.

246.   At all relevant times, Plaintiffs' and the Class Members' insureds were "consumers" as defined in Civil Code § 1761(d). Plaintiffs and the Class Members, upon making payments to their insureds for property damage losses which they

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

sustained, and which are covered under the insurance policies issued to them by the Plaintiffs and Class Members, to the extent of such payments, acquire the rights of their insureds under policy provisions and by operation of law and equity. Accordingly, Plaintiffs and the Class Members "stand in the shoes" of their insureds and are authorized to pursue their subrogation claims and causes of action against third parties such as the Defendants herein who are legally liable for having caused the property damage losses paid by the Plaintiffs and Class Members. Thus, the consumer transactions which were entered into by the insureds of the Plaintiffs and the Class Members have created rights, claims and causes of action which are vested in the Plaintiffs and Class Members who, under contractual and common law principals of subrogation, may enforce these rights of action in the same way as their consumer insureds.

247.  The transactions from which this action arise include transactions involving the sale or lease of goods or services for personal, family or household purposes within the meaning of Civil Code § 1761(d).

248.  Defendants designed, developed, manufactured, marketed, and sold the Class Vehicles containing the defects as alleged herein.

249.  Defendants designed, developed, manufactured, marketed, and sold the Class Vehicles to the Plaintiffs' and Class Members' insureds despite Defendants' knowledge of the defects and the serious safety risks created by the defects.

250.  Defendants made misleading representations and omissions concerning the benefits, performance and safety of the Class Vehicles.

251.  Defendants' marketing and sale of the Class Vehicles as safe despite knowledge that the engine defects posed serious safety risks to consumers; Defendants' failure to disclose the defects and safety risks known to Defendants, but hidden from consumers; and Defendants' knowing concealment of the unreasonable safety risks associated with the Class Vehicles, all are

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

misrepresentations, omissions and concealments of material fact that constitute unfair and deceptive practices in violation of the CLRA.

252.  Defendants violated the CLRA not only when they sold the Class Vehicles and misrepresented the Class Vehicles to be safe for use, but also when they failed to disclose to Plaintiffs' and the Class Members' insureds that the Class Vehicles had known defects that posed a serious safety risk to consumers and the public.  Defendants continue to violate the CLRA by such conduct.

253.  Defendants' deceptive trade practices were designed to induce Plaintiffs' and the Class Members' insureds to purchase or lease the Class Vehicles containing the defects in an attempt to avoid the cost of replacing the defective vehicles already in use.  This deception and harm is ongoing.

254.  Defendants' violations of the CLRA were designed to conceal material facts about the defects and unreasonable safety risks in the Class Vehicles, in order both to induce Plaintiffs' and the Class Members' insureds to purchase or lease the vehicles, and for the Defendants to attempt to avoid the enormous business cost of repairing and replacing the vehicles.

255.  By engaging in the unfair and deceptive conduct described herein and more fully above, Defendants actively concealed and failed to disclose material facts about their defective vehicles.  Such concealment continues to this day.

256.  In purchasing or leasing the Class Vehicles, Plaintiffs' and Class Members' insureds were deceived by Defendants' failure to disclose their knowledge of the defects.

257.  The omissions set forth above regarding the vehicles are material facts that a reasonable person would have considered important in deciding whether or not to purchase or lease a vehicle made and sold by the Defendants. Indeed, no reasonable consumer would have purchased or leased a vehicle if they were informed of the defects.  Had Defendants disclosed the true quality and nature of

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

the Class Vehicles, Plaintiffs' and Class Members' insureds would not have purchased the Class Vehicles.

258. Defendants' acts were intended to be deceptive and fraudulent, namely, as a means to market, distribute, and sell their defective vehicles.

259. Plaintiffs' and the Class Members' insureds suffered an injury in-fact as a direct result of Defendants' violations of the CLRA in that they purchased or leased vehicles which were defective.

260. Defendants' conduct as described herein was and is in violation of the CLRA. Defendants' conduct violates at least the following enumerated CLRA provisions:

(i)     Cal. Civ. Code § 1770(a)(5): Representing that goods have sponsorship, approval, characteristics, uses, benefits, or quantities that they do not have.

(ii)    Cal. Civ. Code § 1770(a)(7): Representing that goods are of a particular standard, quality, or grade if they are of another.

(iii)   Cal. Civ. Code § 1770(a)(9): Advertising goods with intent not to sell them as advertised.

(iv)    Cal. Civ. Code § 1770(a)(16): Representing that goods have been supplied in accordance with a previous representation when they have not.

261. Defendants intentionally and knowingly misrepresented and omitted material facts regarding the Class Vehicles with an intent to mislead Plaintiffs' and Class Members' insureds.

262. In purchasing or leasing the Class Vehicles, Plaintiffs' and other Class Members' insureds were deceived by Defendants' failure to disclose their knowledge of the defective nature of the Class Vehicles.

263. Plaintiffs, other Class Members, and their insureds had no way of knowing Defendants' representations were false, misleading, and incomplete or of knowing the true nature of the defective Class Vehicles.

LEGAL\62042293\1

264.  As alleged herein, Defendants engaged in a pattern of deception and public silence in the face of a known defect. Plaintiffs, other Class Members, and their insureds did not, and could not, unravel Defendants' deceptive conduct on their own.

265.  Defendants knew or should have known their conduct violated the CLRA. Defendants owed consumers a duty to disclose the truth about the defective vehicles because the defective condition of the Class Vehicles created a safety hazard while Defendants possessed exclusive knowledge of that defective condition, intentionally concealed that defective condition from consumers, and/or made incomplete representations in advertisements and on their websites, failing to warn consumers of the defect. Defendants also knew that the Class Vehicles were materially compromised by the defects alleged herein.

266.  Defendants had a duty to disclose that the Class Vehicles were fundamentally flawed because the defective vehicles created a safety hazard, and consumers, including the Plaintiffs' insureds, relied on Defendants' material misrepresentations and omissions regarding the features of the Class Vehicles.

267.  Defendants' violations cause and have caused continuing damages to Plaintiffs, other Class Members, and their insureds while adversely affecting the public interest.

268.  Pursuant to California Civil Code section 1782, Plaintiffs have notified Defendants in writing, both by certified mail and by overnight delivery, of the particular violations of section 1770 of the CLRA relating to the vehicles and demanded that Defendants, among other things, (i) identify all consumers who purchased a covered vehicle and to notify them that Defendants will provide them with an appropriate remedy, including, but not limited to, full reimbursement for compensation for out of pocket losses; (ii) conduct a corrective advertising campaign and destroy all misleading and deceptive advertising materials; and (iii)

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

recall all defective vehicles. Defendants' wrongful business practices constituted and constitute a continuing course of conduct in violation of the CLRA.

269.  Pursuant to California Civil Code section 1780(a), Plaintiffs and the Class Members seek an Order enjoining Defendants from continuing to engage in unlawful, unfair, or deceptive business practices and any other act prohibited by law.

270.  Defendants' wrongful business practices constituted and constitute a continuing course of conduct in violation of the CLRA. Pursuant to Cal. Civ. Code § 1782, if Defendant does not rectify its conduct within 30 days, Plaintiffs intend to amend this Complaint to add claims for:

(i)     Actual damages;

(ii)    Disgorgement and restitution to Plaintiffs, the Class, and general public;

(iii)   Punitive damages;

(iv)    Attorneys' fees and costs; and

(v)     Other relief that this Court deems proper.

**COUNT IX**
**VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW**
**CAL. BUS. & PROF. CODE § 17200, ET SEQ.**
**(INDIVIDUALLY AND ON BEHALF OF THE CLASS)**

271.  Plaintiffs and the Class re-allege and incorporate the preceding paragraphs as if fully set forth herein.

272.  Defendants have engaged in unfair competition within the meaning of the California Business & Professional Code § 17200, et seq. ("**the California UCL**") because Defendants' conduct was unlawful, misleading and unfair, as herein alleged.

273.  Defendants' business practices are unlawful because they violate the California Civ. Code, including at least §§ 1668, 1709, and 1710, and California Commercial Code § 2313.

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

274.  The California Unfair Competition Law ("**UCL**") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

275.  Defendants violated the California UCL when they concealed and failed to disclose the serious safety risks to consumers that their vehicles created, concealed and failed to disclose that their vehicles were defective when they had a duty to disclose these safety risks, and sold the vehicles as if they were fit for ordinary purposes and did not present unreasonable safety risks.

276.  Defendants violated the California UCL when they failed to disclose that their vehicles created serious safety risks and were defective as described herein when they had a duty to disclose the safety risks to consumers and instead falsely misrepresented that their vehicles were safe for consumer use.

277.  Defendants designed, developed, manufactured, marketed and sold their vehicles in an unreasonably dangerous and defective condition.

278.  As is more fully set forth above, Defendants had knowledge of the serious safety risks presented by their vehicles and had knowledge of their defects prior to their sale to Plaintiffs' and Class Members' insureds.

279.  The metal fragments left in the Class Vehicles' engines following machining which caused the connecting rod bearings to prematurely wear and fracture, and insufficient engine oil lubrication channels, constitute safety issues that triggered Defendants' duty to disclose the safety issues to consumers.

280.  Defendants failed to disclose to Plaintiffs and Class Members the material fact that the vehicles posed serious safety risks upon sale, were defective and would prematurely fail and cause fires. Defendants were in exclusive possession of this knowledge.

281.  Plaintiffs' and the Class Members' insureds did not and could not have known of the safety risks created by the vehicles at the time that they purchased or

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

leased their vehicles. Plaintiffs have standing to represent the Class Members in this action.

282.  Despite their knowledge of the serious safety risks that the vehicles presented to consumers and the public, Defendants failed to issue an appropriate warning, recall, or a campaign to replace the vehicles for years, concealing their knowledge both of the defects and the safety issues presented by the vehicles.

283.  Defendants' business acts are unlawful, unfair, and fraudulent within the meaning of the California UCL.

284.  As entities with exclusive knowledge regarding the safety risks and defects in the vehicles, Defendants had a duty to disclose these defects, particularly in light of the fact that the vehicles posed serious safety risks to Plaintiffs' and the Class Members' insureds.

285.  Plaintiffs and the Class Members insuring property and automobiles, as well as their insureds, reasonably expected that Defendants would have disclosed the existence of both the defects and the serious safety risks that the vehicles presented to consumers and the public, and reasonably expected that Defendants would not sell a vehicle that was unsafe and contained an engine that could start a fire or seize in traffic. This information is and was material to Plaintiffs' and Class Members' insureds.

286.  Defendants, at all times relevant, knew or should have known that Plaintiffs and the Class Members did not know of, or could not have reasonably discovered, the safety risks or the defects in the Defendants' vehicles.

287.  By concealing the serious safety risks created by their vehicles and the existence of these defects, Defendants engaged in actionable, unfair, and fraudulent conduct within the meaning of the California UCL.

288.  Had Plaintiffs' and Class Members' insureds known of the serious safety risks and the defects in the vehicles, they would not have purchased or leased the vehicles.

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

LEGAL\62042293\1

289.  These acts and practices have deceived Plaintiffs' and Class Members' insureds and are likely to deceive the public. In failing to disclose the defects and suppressing other material facts from Plaintiffs' and the Class Members' insureds, Defendants breached their duties to disclose these facts, violated the UCL, and caused injuries to Plaintiffs and the Class Members. The omissions and acts of concealment by Defendants pertained to information that was material to Plaintiffs' and the Class Members' insureds, as it would have been to all reasonable consumers.

290.  Defendants' business acts and practices alleged herein are unfair within the meaning of the California UCL. Specifically, by failing to disclose and concealing the existence of defects in the vehicles, Defendants engaged in unfair conduct within the meaning of the California UCL.

291.  Defendants' misconduct is unfair within the meaning of the California UCL as it offends established policy and is immoral, unethical, unscrupulous, and substantially injurious to consumers.

292.  Plaintiffs and Class Members insuring property and automobiles have suffered damages as a result of Defendants' misconduct.

293.  Defendants' unlawful, unfair and fraudulent business acts and practices continue through the date of the filing of this Complaint.

294.  Under the California UCL, Plaintiffs and Class Members request that this Court enjoin Defendants from engaging in business practices that constitute a violation of the California UCL. Plaintiffs and the class further request that this Court enter such orders or judgments as may be necessary to remedy by way of restitution, any amount which may have been incurred due to such unfair practices, as provided for in Bus. & Prof. Code § 17203 and for such other relief as set forth herein.

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

**COUNT X**
**VIOLATIONS OF THE CALIFORNIA SONG-BEVERLY ACT**
**CAL. CIV. CODE §§ 1791 *ET SEQ.***
**(INDIVIDUALLY AND ON BEHALF OF THE CLASS)**

295.  Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

296.  For the purposes of this Count (Count X) only, the definition of "**Class Vehicles**" is restricted to those Class Vehicles that were sold at retail in the State of California. The definition of "Class Vehicles" is otherwise as previously averred.

297.  At all relevant times hereto, Defendants were the designer, manufacturer, distributor, warrantor, and seller of the Class Vehicles. Defendants knew or should have known of the specific use for which the Class Vehicles were purchased.

298.  Defendants provided Plaintiffs' and the Class Members' insureds with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. This implied warranty included, *inter alia,* the following: (i) a warranty that the Class Vehicles and their engines designed, manufactured, supplied, distributed, and sold by Defendants were safe and reliable for providing transportation and would not prematurely and catastrophically fail; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use—providing safe and reliable transportation—while the Class Vehicles were being operated in a reasonably foreseeable manner. The Class Vehicles, however, are not fit for their ordinary purpose because, *inter alia,* the Class Vehicles and their engines suffered from an inherent defect at the time of sale that causes the Class Vehicles to experience premature and catastrophic engine failure.

299.  Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose. Instead, the Class Vehicles are defective, including, but not

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

1  limited to, the engine design defects and defective manufacture of the Class

2  Vehicles' engines.

3      300.  Defendants' actions, as complained of herein, breached the implied

4  warranty that the Class Vehicles were of merchantable quality and fit for such use

5  in violation of California Civil Code §§ 1792 and 1791.1.

6      301.  As a direct and proximate result of Defendants' breach of their implied

7  warranties, Plaintiffs, Class Members, and their insureds suffered property damage,

8  including the loss of use thereof, causing them to sustain damages for which the

9  Defendants and each of them are liable.

10                              **PRAYER FOR RELIEF**

11  WHEREFORE, Plaintiffs and the Class pray for the following judgment:

12  a.     An Order certifying this action as a class action;

13  b.     An Order appointing Plaintiffs as class representatives and appointing

14          undersigned counsel to represent the Class Members;

15  c.     A Declaration that the Class Vehicles are defective;

16  d.     A Declaration that the defects in the Defendants' Class Vehicles create

17          serious safety risks to consumers and to the broader public;

18  e.     Payment to the Class of reimbursement for damages resulting from the

19          replacement and repair of the defective Class Vehicles, in an amount to

20          be proven at trial;

21  f.     Payment to the Class of damages resulting from property damage

22          caused by the Defendants' Class Vehicles, and expenses incurred as a

23          result thereof, in an amount to be proven at trial;

24  g.     Restitution as authorized by law;

25  h.     An award of attorneys' fees and costs, as provided by law and as would

26          be reasonable from any recovery of damages recovered for, or benefits

27          bestowed on, the Class;

28

COZEN O´ CONNOR
601 S. FIGUEROA STREET , SUITE 3700
LOS ANGELES, CA 90017

i.   Interest as provided by law, including but not limited to pre-judgment and post-judgment interest as provided by rule or statute;

j.   An injunction prohibiting Defendants from continuing to engage in unlawful, unfair, or deceptive business practices and any other act prohibited by law; and

k.   Such other and further relief as this Court may deem just, equitable, or proper.

Dated:  March 10, 2023

**COZEN O'CONNOR**

By:   /s/ Nathan Dooley
      Nathan Dooley (SBN 224331)
      NDooley@cozen.com
      601 S. Figueroa Street
      Suite 3700
      Los Angeles, CA 90017
      Tel.: 213.892.7933; Fax: 213.892.7999

      Elliott R. Feldman (*pro hac vice to be filed*)
      Efeldman@cozen.com
      One Liberty Place
      1650 Market Street, Suite 2800
      Philadelphia, PA 19103
      Tel.: 215.665.2071; Fax: 215.701.2282

      Kevin P. Caraher (*pro hac vice to be filed*)
      KCaraher@cozen.com
      123 North Wacker Drive, Suite 1800
      Chicago, IL 60606
      Tel.: 312.382.3192; Fax: 312.706.9792

      *Attorneys for Plaintiffs and the Class*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COZEN O' CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a trial by jury on all claims for which a jury trial is authorized.

Dated:  March 10, 2023                    COZEN O'CONNOR


By: /s/ Nathan Dooley
    Nathan Dooley
    *Attorneys for Plaintiffs*

LEGAL\62042293\1